CAPE RESORT HOTELS, INC. vs. ALCOHOLIC LICENSING
BOARD OF FALMOUTH & another[1]
(and a companion case[2]).

Barnstable. October 8, 1981. — February 5, 1982.

Present: HENNESSEY, C.J., WILKINS, LIACOS, & LYNCH, JJ.

Zoning, Nonconforming use or structure, Variance, Hotel. Laches. Con-
stitutional Law, Public entertainment.

In actions to determine the legality of the operation of a resort facility as a
continuation of a prior nonconforming use under a town's zoning by-
law, the judge correctly concluded that, as a result of changes in the
operation of the facility, it was no longer protected under G. L.
c. 40A, § 6, and the applicable provisions of the by-law. [211-216]
The use of alterations to a preexisting resort facility in accordance with a
building permit was protected by the statute of limitations provision of
G. L. c. 40A, § 7, but such protection extended only to those portions
of the facility actually being so used. [216-219]
A zoning variance for a parking lot in connection with an existing resort
facility did not legalize the uses to which the buildings comprising the
facility were put. [219-220]
Sale of one of the buildings comprising a resort facility did not constitute
an abandonment of the prior nonconforming use of the building.
[220-221]
Where one of the buildings comprising a resort facility, which had been
used as a dormitory for hotel employees, was "converted" into accom-
modations for paying guests of the hotel, the evidence warranted the
conclusion that a change in use had occurred and that, in the absence
of a special permit, such use of the building was in violation of the
town's zoning by-law. [221-224]
Actions to determine the legality of the operation of a resort facility as a
nonconforming use under a town's zoning by-law were not barred by
laches or estoppel. [224-225]

[1] The other defendant is the building inspector of Falmouth.

[2] Falmouth Heights — Maravista Improvement Association & others vs.
Robert Johnson & another. The other plaintiffs are twelve named indi-
vidual residents of the town of Falmouth; the other defendant is Cape Re-
sort Hotels, Inc.

The right of free speech guaranteed to hotel patrons and owners by the Federal and State Constitutions provided no basis for challenging an injunction restricting dancing and music in a hotel operated as a nonconforming use under a municipal zoning by-law. [225-226]

Where injunctive relief was overly restrictive of the operation of a resort facility as a nonconforming use under a town's zoning by-law, this court ordered revision of the judgments in two actions so as to permit those activities which evolved from a prior nonconforming use. [226-227]

CIVIL ACTIONS commenced in the Superior Court on March 14, 1977, and June 3, 1977, respectively.

The cases were heard by *Travers,* J.

The Supreme Judicial Court granted a request for direct appellate review.

*Michael D. Kelly* for Cape Resort Hotels, Inc.

*Edward W. Kirk* (*Edward W. Farrell,* Town Counsel, with him) for Falmouth Heights — Maravista Improvement Association & another.

LYNCH, J.   This appeal involves the legality, as a nonconforming use under the zoning by-law of the town of Falmouth, of the current operation of a resort facility located in that town.   The facility is owned by Cape Resort Hotels, Inc. (Cape Resort), and is known as the "Brothers Four." The appeal consists of two actions which were consolidated for trial.   In the first action, Cape Resort seeks a declaratory judgment establishing its right to serve liquor without food or with hors d'oeuvres only and to offer live entertainment in a certain section of its main building.   In the second action, twelve residents of Falmouth and an association of residential property owners from the Falmouth Heights area of Falmouth where the Brothers Four is located (hereinafter collectively known as "the association") seek to enjoin the present operation of the main building and two related buildings on the ground that the use of these buildings is in violation of relevant sections of the zoning by-law.   The plaintiffs in the second action also seek an order directing the building inspector of Falmouth to enforce the zoning

by-law with respect to Cape Resort's facility. The building inspector included in his answer a cross complaint against Cape Resort by which he seeks to enjoin Cape Resort from operating the Brothers Four and its outbuildings in a manner which violates the zoning by-law.[3]

A judge of the Superior Court heard oral testimony, reviewed written evidence, and took a view of the hotel premises. He made extensive findings of fact on the past and present operation of the buildings owned by Cape Resort. He then held that (1) the current use of the ground floor facilities of the Brothers Four was an impermissible extension or change of a prior nonconforming use, (2) the use made of that portion of the ground floor known as the "frolic room" was nevertheless protected by the provisions of G. L. c. 40A, § 7 (3), the use of a building called the "lodge" was a lawful prior nonconforming use, and (4) a building known as the "annex" could lawfully be used to house employees of the hotel but not to lodge hotel guests. The judge found both mandamus and injunctive relief to be appropriate. Both Cape Resort and the association have appealed. We

---

[3] It could be argued that the Superior Court lacked jurisdiction to hear the action brought by the Falmouth residents and neighborhood property owners. See *McDonald's Corp.* v. *Seekonk*, 12 Mass. App. Ct. 351 (1981); *William C. Bearce Corp.* v. *Building Inspector of Brockton*, 11 Mass. App. Ct. 930 (1981); *Neuhaus* v. *Building Inspector of Marlborough*, 11 Mass. App. Ct. 230 (1981).

It seems clear, however, that a landowner in doubt about the propriety of the use of his property under a zoning by-law may seek declaratory relief (as Cape Resort did in the first action) without making a demand on the building inspector under G. L. c. 40A, § 7. Furthermore, since the answer of the building inspector in the landowners' action and his cross complaint in the second action sought a judicial determination of the rights of Cape Resort under its nonconforming use and requested that Cape Resort be enjoined from engaging in any act in violation of the Falmouth zoning by-law, all issues raised in the second action are properly before us and it is, therefore, unnecessary to reach the issue of the right of the neighbors to maintain their action. It should be noted that this issue of the neighbors' right to maintain an action in their own names is not argued before us and apparently was not pressed in the Superior Court.

find no error in the judge's rulings but remand for reconsideration of the scope of the injunctive relief granted.

We review the facts concerning the main building of Cape Resort's facility (hereinafter "the hotel") as found by the judge. Facts relative to the buildings known as the "lodge" and the "annex" will be outlined in our discussion of the legal issues raised by their use.

The hotel was built before the turn of the century and was known, until relatively recently, as the "Terrace Gables." It is located in the Falmouth Heights section of Falmouth. Falmouth Heights was originally a neighborhood of mostly single-family summer homes with a smattering of summer hotels. While there are still many private homes, the area now includes a significant number of guest houses and rental properties, some of which have been rented in recent years to groups of unrelated persons. From 1926, when zoning was adopted in Falmouth, until the mid-1950's the Terrace Gables functioned as a traditional, full-service summer resort hotel for a mostly middle-aged and older clientele. Guests were met at the train or bus station by hotel personnel and stayed at the hotel for periods ranging from a week to the entire season. The ground-floor layout included a dining room, kitchen, lobby and reading area, sitting and television room, and porch. There were also a few guest rooms behind the lobby. The hotel offered three meals a day on an American or European plan. The dining room was also open to the public. A wide variety of food was cooked and served on the premises. Guests were required to "dress" for dinner. There were no separate bars or cocktail lounges, although drinks were available in the dining room[4] at tables and at a small bar on one side of the dining room. A piano player or trio occasionally provided music during the dinner hour. A range of entertainment was provided in the evenings. These activities, including cards, bingo, and movies, were generally concluded by

---

[4] There was no allegation that the hotel has not always had the proper liquor licenses (except during prohibition when no licenses were issued).

10 P.M. After the dinner hour most of the people on the hotel property were hotel guests. The hotel occasionally sponsored dances and concerts which would run until 1 A.M. Cocktails were available at these functions and the public was welcome. The hotel served as "a center of social life on the Heights."

The 1950's and 1960's were a period of transition for the hotel. There was a change in management and more advertising to encourage nonguests to patronize the hotel for dining, dancing, cocktails, and entertainment. The effort to attract the public was also reflected in changes made in the physical layout. In the early 1950's, a small cocktail lounge was built from a part of the dining room. In 1954, the outside porch was enclosed to create additional interior space. The former reading area became a coffee shop in 1960 and lunch was no longer served in the dining room. The hotel moved to a modified American plan for food. A cocktail lounge called "club 46" was opened. It offered a "happy hour" and music and dancing on weekends until midnight. In 1962, the ground-floor guest rooms were removed, the coffee shop was converted into a cocktail lounge, club 46 was closed, and a new "frolic room" was created and later enlarged. The judge found that the frolic room became "the principal focus of entertainment for guests and the public."

Large numbers of young people came to the frolic room for a late afternoon "happy hour" and for dancing and entertainment in the evening. Traffic and parking problems developed and there was a significant amount of noise at closing time. A variance was granted in 1969 for the creation of a parking lot. A fee was charged to all except guests of the hotel. In 1970, there was another change in management. The clientele attracted to the hotel became increasingly younger and control problems increased.

The current management, Cape Resort, bought the hotel in 1971. With very few structural changes, Cape Resort has developed the hotel's entertainment offerings to such an extent that it describes the hotel in its advertising as "the largest

entertainment complex on Cape Cod" and "Three Clubs under One Roof." The "three clubs" are the "pub," the "show lounge," and the "disco." The pub (in what was once the reading area) has a bar, jukebox, games, and live music in the evenings. It can accommodate 89 people and is open until 1 A.M. The show lounge is the former frolic room. In 1979-1980, it was only open on weekends. It has two bars, a dance floor, and a stage and can hold 382 people. The show lounge features entertainment, musical groups, and dancing. The disco is what was once the dining room. It has a dance floor and three bars and features complex light displays and sound equipment controlled by a "disc jockey." Three hundred and sixty-four people can be accommodated for dancing and drinking. Under the name "club car" the disco is open in the morning for breakfast and in the evening for light food. The ground floor also contains a "game room" with electronic games, drinks, and room for forty-eight people. In addition to the regular schedule of entertainment, the management advertises a variety of special events, including, for example, summer Halloween and New Year's Eve parties, "beat the clock" nights during which drinks become progressively more expensive, and audience participation shows such as a "gong show," "creative goldfish eating" and pie eating contests, and talent shows, for which the winners are awarded prizes. Tickets for these special events are distributed at closing time and on the beaches during the day.

The judge made factual findings on parking facilities, number of employees, and the income generated by the hotel. These figures show that there are an estimated 104 to 175 parking spaces available for over 100 guests, 40 to 60 employees, and a potential holiday weekend crowd of over 800 people. As very little parking is allowed on neighborhood streets, there have been some problems with patrons parking on private land. Information on the distribution of hotel employees suggests that the bulk of them are employed as waiters, waitresses, and bartenders. Only four or five are employed to prepare food. The income figures for the

385 Mass. 205                                              211

Cape Resort Hotels, Inc. v. Alcoholic Licensing Board of Falmouth.

years 1971-1977 show steadily increasing revenues over-all but steadily decreasing revenues from room rentals.[5]  In each year from 1971 to 1977 for which appropriate figures are available, charges for liquor and admission accounted for sixty to eighty percent of the over-all revenues generated by the hotel.  Prices for food, drinks, and admission have increased much faster than charges for rooms, although the judge took note of the fact that the rooms are old-fashioned, and low rates may be necessary to achieve an acceptable occupancy rate.

Finally, the judge found that complaints generated by the operation of the Brothers Four related primarily to noise at closing time, especially on weekends, and parking problems.  Although management has made efforts to control the crowds, closing time is frequently marked by loud talk, laughing, some fights, and considerable traffic noise.  Thus, even though control problems are less severe than they were in the 1960's, neighbors are still sometimes awakened or kept awake until 2 or 3 A.M.  These problems are affected by the fact that the neighborhood contains two establishments which attract a clientele similar to, although smaller than, that of the Brothers Four.  Guest houses in the area also add to the general outdoor activity.

1. *Ground-floor hotel entertainment facilities.*  All parties, and the judge, agree that in 1926 the hotel was a nonconforming use under the original Falmouth zoning by-law.[6]  Therefore, as a prior nonconforming use, the hotel is

---

[5] As the judge pointed out, at the occupancy rate and room charges named by Cape Resort, the revenue from room rentals should have been much higher than it actually was.  This discrepancy led the judge to question whether the hotel aspect of the operation was being deliberately maintained despite its limited financial return or even whether the income figures had been rearranged to conceal how unprofitable certain aspects of the hotel operation had become.

[6] Cape Resort and the association stipulated that, at all times between 1926 and the present, the hotel has been located in an area zoned residential.  The record does not reveal the exact manner in which the hotel failed to conform to the 1926 by-law.

not in violation of the by-law.[7]  The primary question presented by these appeals is whether there has been such a "change or substantial extension" of that use that the current operation of the hotel is no longer protected under G. L. c. 40A, § 6, and § 18, of the Falmouth zoning by-law, as a valid continuation of the 1926 nonconforming use.  We agree with the judge that there has been such a change.

*Bridgewater* v. *Chuckran,* 351 Mass. 20 (1966), sets out the three tests this court has adopted to determine whether a current use of property is a protected nonconforming use: "(1) Whether the use reflects the 'nature and purpose' of the use prevailing when the zoning by-law took effect. . . . (2) Whether there is a difference in the quality or character, as well as the degree, of use. . . . (3) Whether the current use is 'different in kind in its effect on the neighborhood.'" (Citations omitted.) *Id.* at 23, quoting from *Massachusetts Broken Stone Co.* v. *Weston,* 346 Mass. 657, 662 (1964), and *Medford* v. *Marinucci Bros. & Co.,* 344 Mass. 50, 60 (1962).  The property owner bears the burden of proving the requisite similarity between the current use and the original nonconforming use. *Bridgewater* v. *Chuckran, supra* at 24.  The facts found by the judge support his conclusion that the current use of the hotel satisfies none of the three standards.

The nature and purpose of the use made of the hotel's facilities have changed dramatically.  In 1926, the property was operated as a full-service resort hotel whose primary purpose was to provide lodging, meals, and entertainment for overnight guests.  In recent years, by contrast, management has presented the hotel to the public as "the largest entertainment complex on Cape Cod."  The hotel has been billed as "Three Clubs under One Roof" with the aim of attracting the public in large numbers.  The change is com-

---

[7] Section 18 of the Falmouth zoning by-law reads as follows: "Non-Conforming Uses.  (a) Any building, part of a building or premises which, at the time of the adoption of this by-law, is being put to a nonconforming use may continue to be used for the same purpose."  Zoning By-Laws of the Town of Falmouth § 18 (amended through July 1, 1975).

parable to that in *Bridgewater* v. *Chuckran, supra,* where property formerly used in connection with a house building business became the site of a concrete manufacturing and supply business. This court found a change in the nature and purpose of the use where the mixing of concrete had been transformed from a "merely incidental" aspect of the general construction business to a major enterprise in which the sale of concrete to others dominated. *Id.* at 23. In *Wellesley* v. *Brossi,* 340 Mass. 456 (1960), the prior noncon- forming use of the property in question was the incidental storage of materials and equipment in connection with the resident's part-time masonry work. The court found that the storage of a large amount of material in connection with a full-time masonry and general building business was not a continuation of, but rather a change in the character and purpose of, the prior nonconforming use. *Id.* at 465.

In the case now before us, lodging and meals have been supplanted as the dominant business of the hotel by fully developed entertainment facilities designed especially to at- tract crowds of young people. The judge's description of the current situation is apt: "[T]his enterprise is much less a hotel with entertainment facilities present for its guests and the public, than it is an entertainment complex with some guest rooms."

A comparison of the 1926 and current uses of the hotel demonstrates a fundamental difference in "the quality or character, as well as the degree, of use." *Bridgewater* v. *Chuckran, supra* at 23. The same space which formerly housed a dining room, reading room, guest rooms, and lob- by now houses seven bars distributed among three "clubs" and a game room. A kitchen equipped to prepare large quantities of food for diners who ate in the dining room has been scaled down to a small, short-order operation not much greater than that found in many households and staffed by only three or four employees. A predominately middle-aged and older clientele has been displaced by young people who are encouraged to patronize the hotel for its bars and nightlife. While the hotel has always served

liquor, it was formerly served only in the dining room and at occasional dances. Now the sale of liquor accounts for sixty to seventy percent of the hotel's revenues and is a central focus of the hotel's entertainment facilities. While hotel guests and the public were offered bingo, cards, movies, and dances in the lobby in 1926, today's guests are offered a choice among three night-clubs. Changes far less drastic than these have been held to constitute impermissible differences in quality. See, e.g., *Jasper* v. *Michael A. Dolan, Inc.*, 355 Mass. 17 (1968) (change from sale of beer and wine in connection with food store to sale of all alcoholic beverages in separately-conducted package store); *Hinves* v. *Commissioner of Pub. Works of Fall River*, 342 Mass. 54 (1961) (catering service involving cooking and preparation of food is use different in quality from operation of a grocery store).

Cape Resort's reliance on the rule that a mere increase in the volume of business done does not constitute a change in use is misplaced. While it is true that a use is not different in kind simply because it is bigger, *Building Comm'r of Medford* v. *McGrath*, 312 Mass. 461, 462 (1942), the increased use must be attributable to growth of the original nonconforming use in order to fall within the rule. *Kreger* v. *Public Bldgs. Comm'r of Newton*, 353 Mass. 622, 627 (1968). Even where the facility in which a business is conducted remains the same, a significant increase in activity caused by a change in operating procedures will not be protected. *Id.* In the *Kreger* case, the increased business followed a change from a retail to a wholesale fuel oil operation. In the case of the hotel, the increased activity followed a shift in emphasis from lodging and meals to night entertainment. As in *Kreger*, this was more than a growth in business; it was a substantive change in use.

Cape Resort argues that the changes that have been made in the hotel's ground-floor entertainment offerings merely reflect changes in public tastes in the years between 1926 and the present and that a disco and electronic game room are, in effect, modern equivalents of dances in the hotel

lobby and bingo. It is true that a valid nonconforming use does not lose that status merely because it is improved and made more efficient. *Berliner* v. *Feldman,* 363 Mass. 767, 775 (1973). *Wayland* v. *Lee,* 325 Mass. 637, 643 (1950). Such changes are permissible, however, only if they are "ordinarily and reasonably adapted to the original use and do not constitute a change in the original nature and purpose of the undertaking." *Berliner* v. *Feldman, supra.* The facts found by the judge (which are amply supported by the evidence) indicate that the expansion and updating of the hotel's activities were not adapted to the original nonconforming use. Thus the shift from hotel to "entertainment complex" constitutes a change in the nature and purpose of the undertaking. This transformation of the hotel cannot be justified as "modernization" to accommodate a changed society.

Cape Resort urges us to conclude that the entertainment facilities in question are a permissible aspect of the hotel business. In support of this claim it cites cases such as *Goff* v. *Fowler,* 3 Pick. 300 (1826), and *Bennett* v. *Inspector of Bldgs. of Cambridge,* 270 Mass. 436 (1930). Both of these cases involved issues of statutory construction and not the issue whether a hotel's status as a valid nonconforming use is affected by a significant growth in entertainment offerings. The question in *Goff* was whether a building near an inn was a "dependency" of the inn (under a statute regulating liquor licenses) and therefore covered by the inn's liquor license. In *Bennett* a property owner had been granted a permit to erect a hotel which contained a banquet hall and the issue was whether the hall was authorized by a provision of the relevant zoning by-law which permitted "accessory" buildings to be used for "business . . . customarily incidental to the building of which it is an accessory." *Bennett, supra* at 441. In any event it is clear that the sale of alcohol in *Goff* and the banquet hall in *Bennett* were found to be incidental to the primary use of the property as a hotel. As the judge's findings in the instant case demonstrate, both the current operation of the Brothers Four and the advertis-

ing suggest that lodging and food service at the hotel have become "dependencies" of the primary use as an entertainment complex. It could hardly be maintained that the current operation of the ground-floor entertainment facilities, together with the minimal sale of food and lodging, is "common in the conduct of hotels." *Bennett* v. *Inspector of Bldgs. of Cambridge, supra* at 444. Support for this conclusion can be found in the fact that Cape Resort has adopted the name Brothers Four rather than Terrace Gables Hotel or Cape Resort Hotel. Cf. *Bridgewater* v. *Chuckran, supra* (change of name in telephone listing and on vehicles of business supported finding of change in use).

Finally, it is clear that the judge was correct in finding that the current use of the hotel property has an effect on the neighborhood "different in kind" from the effect of the use in 1926. Even when allowance is made for the limited use of automobiles in 1926, it is clear that the development of the hotel as a nighttime entertainment center capable of accommodating over 800 people has caused traffic and noise problems wholly different from those which would be generated by a business run primarily as a hotel. The change in effect on the surrounding area is sufficiently illustrated by the findings that nearby residents are sometimes kept awake until 2 or 3 A.M. and that management has found it advisable to station up to twelve employees outside the hotel at closing time to direct traffic and promote order. The findings, therefore, fully support the judge's conclusion that, under all three of the tests reviewed in *Bridgewater* v. *Chuckran, supra,* Cape Resort has failed to sustain its burden of proving that the operation of the hotel is not a change in use.

2. *Effect of building permits and variance granted to prior owners of hotel.* Cape Resort also contends that the present use of the hotel's ground-floor facilities is protected by the statute of limitations contained in G. L. c. 40A, § 7.[8]

_____

[8] The original version of this statute of limitations was passed in 1970 and was found in G. L. c. 40A, § 22. See St. 1970, c. 678, § 1. General

The claim is that the current use of the hotel is in accordance with certain permits granted to previous owners and that the passage of over six years since the use allowed by these permits commenced bars any action to limit the current use. The facts on which this claim rests are as follows. In 1956, the hotel's owner received a permit to enclose an open porch on one corner of the hotel. The application for the permit states only that the owner proposes to enclose a porch. There is no indication as to the reasons or need for the change. In 1961, a further building permit was granted. The application for this permit states that the owner "propose[s] to add 21' x 43' to side of present hotel & remodel a portion of interior." When it was completed, this addition housed the frolic room. It now houses the show lounge.

The judge found that the current use of the original frolic room is protected under G. L. c. 40A, § 7, while the uses being made of the remainder of the ground floor of the hotel are not. We agree with those conclusions.

Well over six years had elapsed between the time the frolic room was built in 1961 and the time the association brought its action to compel Cape Resort to limit its use of the space in 1977. Thus, c. 40A, § 7, bars the attempt to enforce the by-law with respect to the frolic room if it "has been improved and used in accordance with the terms of the original building permit." The association argues (1) that § 7 has no application to this case because "original building permit" is limited to a permit which authorizes the "erection of a new and independent building or structure," and

Laws c. 40A, § 7, which was part of a new c. 40A passed in 1975, see St. 1975, c. 808, § 3, reads in pertinent part (with former § 22 language in brackets): "[I]f real property has been improved and used in accordance with the terms of the original building permit, . . . no action . . . , the effect or purpose of which is to compel the abandonment, limitation or modification of the use [contemplated] allowed by said permit . . . by reason of any alleged violation of the provisions of this chapter, or of any . . . by-law adopted thereunder, shall be maintained, unless such action . . . is commenced . . . within six years next after the [issuance of such permit] commencement of the alleged violation of law."

that the 1961 permit was not such a permit,[9] and (2) that, in any event, the frolic room is not now being used in accordance with the 1961 permit. `

We agree with the judge that the meaning of "the original building permit" is not as narrow as the association suggests. The association's position rests largely on an erroneous interpretation of the words "real property," in the phrase "if real property has been improved and used in accordance with the terms of the original building permit," as including only raw land. "Real property," however, has always comprised both land and buildings. *Bates* v. *Sparrell,* 10 Mass. 323, 324 (1813) ("things real are lands, tenements, and hereditaments" [citing Blackstone]). Furthermore, the phrase "use allowed by said permit" is not limited only to a new and distinct use to which a new building would be put, as the association would have it. The use may be a new one or it may be the same as the use to which an existing structure on the land is being put. Under the association's view of § 7, no alterations of or additions to existing buildings, even those undertaken in accordance with properly issued building permits, would be protected by the § 7 statute of limitations. This result conflicts with the obvious intent of the Legislature to limit the time within which building permits could be attacked as issued in violation of a zoning regulation. See generally Holmes, Zoning Limitations — Limiting Enforcement of Laws Relating to Buildings, 55 Mass. L.Q. 377 (1970). The judge correctly interpreted the words "original building permit" as meaning the first permit issued with respect to a particular improvement of real property. We need not decide the exact range of improvements to real property to which the words "original building permit" might apply. The frolic room was clearly such an improvement, and the permit authorizing its construction was the "original building permit" for purposes of our analysis.

---

[9] The association concedes that there may not have been such a permit for the erection of the original Terrace Gables Hotel.

The "Preliminary Layout" which accompanied the 1961 application for a permit to build the frolic room indicated very clearly that the space would include a bar, cocktail lounge, and entertainment facilities. Although the record contains only the application for the permit, and not the permit itself, all parties appear to concede that a permit was issued, and the judge so found. The show lounge currently occupying the space is being used for the same purposes as its predecessor, the frolic room, was used, i.e., afternoon "happy hours" and dancing, drinking, and entertainment in the evening. Thus, Cape Resort meets the requirement that the space be "used in accordance with the terms of the original building permit." G. L. c. 40A, § 7. The judge correctly held that even if this use of the space was illegal in 1961, under G. L. c. 40A, § 7, the association's action to enjoin that use comes too late.

Cape Resort's further contention that G. L. c. 40A, § 7, protects the entire present use of the hotel's ground floor must, however, be rejected. The sole support for this contention is the fact that an open porch on the ground floor was enclosed pursuant to a 1956 building permit and for the purpose of enlarging the inside floor area. Cape Resort introduced no evidence of the use to which the enclosed porch was put in 1956. It appears from a drawing of the present layout of the hotel's ground floor that the porch no longer constitutes a distinct space in the hotel but is simply a part of the game room. In short, Cape Resort did not meet its burden of showing that the porch is being "used in accordance" with the permit authorizing its enclosure. Under these circumstances the 1956 permit cannot serve as the source of any additional protection for the current use of the hotel.

Finally, it is also clear that permission to operate the present ground-floor facilities cannot be implied from a variance for a parking lot granted to a prior owner of the hotel in 1969 by the Falmouth board of appeals. All the hotel's owner requested and all he received in 1969 was permission to use a vacant portion of his land for a parking lot,

for which fees would be charged. The legality under the zoning law of the activities carried on inside the hotel was not before the board of appeals and was not necessary to its decision. So far as the board's written decision reveals, the board assumed only that the Terrace Gables Hotel was a permitted nonconforming hotel in a residential area. The specific findings supporting the decision to grant the variance related to the inability of the hotel owner to provide adequate parking space for guests unless he could build a new lot. The effect of the variance was to alleviate parking problems at the hotel, not to legalize all uses to which hotel buildings were being put. The judge correctly refused to attribute any broader significance to the granting of this variance.

3. *Use of the "lodge" to house guests.* The lodge is a small wooden structure located to the rear of the main hotel building. It contains fourteen guest rooms and was used prior to 1962 for housing guests of the hotel. The association in effect concedes that this use of the lodge was a valid prior nonconforming use. In 1962 the lodge was conveyed to a Mr. and Mrs. Daley. There was evidence that the Daleys used the lodge as a rooming house. On June 27, 1975, Cape Resort acquired the property and it was used again to accommodate overnight guests of the hotel. The association contends that the lodge enjoyed protection as a nonconforming use only by virtue of its association with the main hotel building and that it lost that protection when it was separated from the hotel and sold in 1962. The association characterizes the 1962 conveyance as an abandonment of the use of the lodge to house hotel guests. Under § 18(d) of the Falmouth zoning by-law, "when a non-conforming use has been discontinued for a period of one year, it shall not be re-established . . . ." The word "discontinued" is the legal equivalent of "abandoned." *Pioneer Insulation & Modernizing Corp.* v. *Lynn*, 331 Mass. 560, 565 (1954).

We agree with the trial judge that the evidence does not establish an abandonment. Under our cases an abandonment of a nonconforming use results from the concurrence

of (1) an intent to abandon and (2) voluntary conduct which carries the implication of abandonment. *Pioneer Insulation & Modernizing Corp.* v. *Lynn, supra. Dobbs* v. *Board of Appeals of Northampton,* 339 Mass. 684, 686 (1959). The sale of property protected as a nonconforming use does not by itself establish an abandonment of the use. *Wayland* v. *Lee,* 325 Mass. 637, 642-643 (1950). 82 Am. Jur. 2d Zoning and Planning § 181 (1976). See *Revere* v. *Rowe Contracting Co.,* 362 Mass. 884, 885 (1972) ("The right to continue . . . a nonconforming use after adoption of zoning regulations is not personal to the particular owner or occupant on the effective date of the regulation"). In this case the lodge has at all times been used for the commercial housing of guests. Furthermore, we find no violation of § 18(c) of the Falmouth zoning by-law, which provides that "[w]herever a non-conforming use has been changed to a more restricted use or to a conforming use, it shall not again be changed to a less restricted use." The judge's conclusion that the changes in ownership did not produce any material change in the use of the lodge was warranted by the evidence.

4. *Use of the "annex" to house hotel guests.* The annex is, like the lodge, a small wooden building behind the main hotel. Until 1962 the annex was used as a dormitory for hotel employees. It was sold in 1962 to Asco Real Estate Trust and was acquired by Cape Resort in 1972. The judge found that some time after 1972 the annex was "converted" into accommodations for paying guests of the hotel. He noted, though, that there was no "significant evidence . . . concerning what, if any alteration or renovations were done to effect this conversion." In 1977 Cape Resort applied for and received a permit "to repair existing annex due to fire damage by replacing damaged area." The record does not reveal whether the work done pursuant to this permit facilitated the change from employees' quarters to guest accommodations. There was also no evidence on whether the shift in clientele provoked a change in the effect on the neighborhood.

The association has never challenged the lawfulness of the use of the annex as an employee dormitory, and we assume that this use was protected as a nonconforming use. At trial the association apparently argued that the prior nonconforming use of the annex had been lost by abandonment. All that has been shown, however, is that the property was sold in 1962. As we held above, a mere change in ownership does not make out an abandonment.

The remaining issue is whether the change in lodgers from employees to paying guests is an impermissible change of the nonconforming use. Under § 18(a) of the Falmouth zoning by-law "a non-conforming use may continue to be used for the same purpose." [10] Cape Resort argues that the current use of the annex meets the tests set out in *Bridgewater* v. *Chuckran*, 351 Mass. 20 (1966), and discussed above.

Although the question is a close one, the evidence warrants the judge's conclusion that a change in use occurred. Several previous decisions of this court support this conclusion. In *McAleer* v. *Board of Appeals of Barnstable*, 361 Mass. 317 (1972), a nonconforming inn had been granted a special permit to convert a dormitory for employees into "motel-like accommodations for overnight guests," *id.* at 322, under a by-law provision authorizing alterations of nonconforming buildings or structures upon the grant of such a special permit. A Superior Court judge annulled the decision to grant this permit because of the prospective conversion of the dormitory "to a type of use different from [the original nonconforming use]." *Id.* at 319. This court affirmed, holding that "the occupation by lodgers of what had been employees' quarters," *id.* at 321, was a change in use. It is true that in *McAleer*, structural changes were to be made in order to effect a change in use and this court's opinion noted that "a change is proposed not only in the use but also in the nature of the facilities." *Id.* at 322. How-

---

[10] Under G. L. c. 40A, § 6, local zoning by-laws shall apply to "any change or substantial extension" of a prior nonconforming use.

ever, even assuming that in the instant case the lack of evidence of structural changes establishes that there were none,[11] we think a change in purpose under § 18(a) of the by-law has been demonstrated. *McAleer* suggests as much, since physical alterations of a nonconforming structure (pursuant to a permit) were clearly authorized by the relevant by-law; the issue was whether the physical alterations were desired in order to effect a change in use.

Furthermore, the change in use of the annex is analogous to the change in use in *Lexington* v. *Bean*, 272 Mass. 547 (1930). It was held there that "[t]he use of [a building] . . . for the commercial purpose of repairing motor vehicles for hire is 'substantially different' [under the relevant by-law] from [the prior valid nonconforming] use of it by a person residing on the premises for the purpose of repairing motor vehicles belonging to him as incidental to his trucking and express business and the occasional permissive use of it by persons storing automobiles on the premises." *Id.* at 553. In the case of the annex, the building was formerly used as lodgings for employees, a use incidental to the operation of the main building as a hotel. Now the annex is being operated as a commercial venture in its own right. In effect, Cape Resort has expanded the use of the annex by adding a new service. Such an expansion has been held to constitute a change in use. *Jasper* v. *Michael A. Dolan, Inc.*, 355 Mass. 17, 24 (1968) (addition of hard liquor to store selling beer and wine). See also 1 R.M. Anderson, American Law of Zoning § 6.46 (2d ed. 1976).

The evidence warranted the judge's conclusion that a change in use of the annex had occurred and that its current use to house guests of the hotel is in violation of Falmouth's zoning by-law. We note, as the judge did, that Falmouth's by-law has been amended since these suits were begun so

---

[11] We note that Cape Resort bore the burden of proof on the nonconforming use issue. *Wellesley* v. *Brossi*, 340 Mass. 456, 460 (1960). *Colabufalo* v. *Public Bldgs. Comm'r of Newton*, 332 Mass. 748, 751 (1955). If Cape Resort believed that the absence of structural changes was legally significant, it bore the burden of establishing this fact at trial.

that nonconforming structures or uses may now be extended, altered, changed, or rebuilt if a special permit is obtained from the board of appeals. Zoning By-Laws of the Town of Falmouth § 1222 (adopted April, 1979). Since the 1979 by-law also provides that hotels are allowed in single residence districts upon a grant of a special permit (see § 3315[a]), both § 1222 and § 3315(a) provide avenues by which the current use of the annex might be legalized. In short, the town of Falmouth makes provision in its zoning by-law for property owners in Cape Resort's position. Cape Resort should seek its remedy at the local level.

5. *Laches and estoppel.* Cape Resort concedes in its brief that "prior Massachusetts case law establishes that laches or estoppel is not a defense to an action to enforce municipalities' by-laws or zoning ordinances." See *McAleer* v. *Board of Appeals of Barnstable,* 361 Mass. 317, 322-323 (1972) (laches); *Ferrante* v. *Board of Appeals of Northampton,* 345 Mass. 158, 162 (1962) (estoppel); *Everett* v. *Capitol Motor Transp. Co.,* 330 Mass. 417, 421 (1953) (laches). This is true even where there has been a substantial financial investment of the sort Cape Resort alleges occurred in its own case. *McAleer, supra* at 322.

Nevertheless, Cape Resort urges us to find that the relief sought by the association and the building inspector is barred, citing us to the only decision of this court in a zoning case which appeared to apply a laches theory, *Chilson* v. *Zoning Bd. of Appeals of Attleboro,* 344 Mass. 406, 409 (1962). In *Chilson,* however, the town building inspector had approved the landowner's move of a nonconforming use from one building to another on the same premises, and the move had been prompted by the town's relocation of a street. Furthermore, this court found that the move "was colorably within the exemption applicable to nonconforming uses." *Id.* Whatever the exact reach of the *Chilson* holding might be, see *McAleer* v. *Board of Appeals of Barnstable, supra* at 323,[12] it does not cover this case. Neither

[12] It was pointed out in *Gattozzi* v. *Director of Inspection Servs. of Melrose,* 6 Mass. App. Ct. 889, 890 (1978), that there is some question

the dramatic changes in the nonconforming use of the hotel's ground-floor space nor the changed use of the annex were specifically approved by an official charged with enforcing the Falmouth zoning by-law. Furthermore, the development of the hotel as an entertainment complex was not colorably within the exemption provided in the by-law for nonconforming uses. Laches and estoppel provide Cape Resort with no defense, and we decline the invitation to overrule prior cases establishing this rule.

6. *Constitutional claims and scope of relief granted.* Cape Resort argues that the First and Fourteenth Amendments to the United States Constitution and art. 16 of the Declaration of Rights of the Massachusetts Constitution prohibit a court from restricting dancing and music in any nonconforming hotel, whether or not the hotel offered entertainment at the time it became a nonconforming use, on the theory that any such restriction would violate the hotel patrons' and owners' rights of free speech. On this ground, Cape Resort challenges the injunction entered against it. The only case cited in support of this proposition is *Commonwealth* v. *Sees,* 374 Mass. 532 (1978). In *Sees* this court struck down, solely under art. 16, a city's application of a local ordinance to prohibit topless dancing in a bar. The opinion of the court emphasized that the ordinance as applied in *Sees* involved town officials in distinguishing protected expression on the basis of content and that no governmental interest was shown to warrant the effort. *Id.* at 537. In this case, there is no contention that the zoning by-law of Falmouth has been applied for such an impermissible purpose. *Sees* neither held nor implied that the owner of a non-

---

whether laches is an available defense in actions in the nature of mandamus to compel a building inspector to enforce a zoning ordinance. Compare *Chilson* v. *Zoning Board of Appeal of Attleboro,* 344 Mass. 406, 409 (1962), with *McAleer* v. *Board of Appeals of Barnstable,* 361 Mass. 317, 323 (1972). Since we find that even under *Chilson* laches would not be a defense in this case, we do not reach this issue. In many cases, however, the statute of limitations in G. L. c. 40A, § 7, will make it unnecessary for defendants to rely on laches or estoppel.

conforming hotel has an absolute right to develop facilities for music and dancing on as large a scale as he sees fit. Cape Resort points to no case so holding. No constitutional violation has been made out.

Cape Resort does appear, however, to have a valid complaint with respect to the scope of the injunctive relief ordered by the judge. Cape Resort was enjoined "from using those portions of the ground floor facilities known as the Disco Room . . . , the Pub, and the Game Room for the purposes of selling or providing alcoholic beverages, providing live entertainment, providing recorded music and dancing, and providing coin operated machines such as pinball machines and billiard tables." The judge specifically found, however, that in 1926, when the hotel became a nonconforming use, drinking, music, and dancing were offered to some extent in some of the areas covered by the injunction.

It appears, therefore, that the injunction ordered by the judge was too broad. We remand the cases for reconsideration of the scope of the relief granted in light of the scope of the protected prior nonconforming use. In fashioning a revised injunction, the judge should seek to ensure that Cape Resort operates its facility as a hotel, with primary focus on lodging, meals, and entertainment for overnight guests. Any upgrading of the hotel which is reasonably adapted to these functions would be permissible. Thus, dining facilities may be open to the public and in conjunction with these facilities music and alcoholic beverages may be provided. Rooms not used for dining (apart from the frolic room which draws its protection from another source) may be used for recreational activities ancillary to the hotel use. It would also be appropriate for the hotel to hold dances or other similar events for the general public as long as this type of activity is merely ancillary to the primary use of the property as a hotel furnishing meals and lodging to overnight guests. In short, the revised injunction should limit Cape Resort's activities to those that could be said to

have reasonably evolved from the basic 1926 use of the property as a hotel.

The judgments are reversed and the cases are remanded to the Superior Court for the entry of new judgments providing relief consistent with this opinion.

*So ordered.*