RAYMOND MOREIS *vs.* BOARD OF APPEALS OF OAK BLUFFS;
FRANK M. FENNER, trustee,[1] intervener.

No. 03-P-932.

Dukes. April 7, 2004. - September 15, 2004.

Present: BECK, DUFFLY, & MILLS, JJ.

*Zoning,* By-law, Building permit, Enforcement, Nonconforming use or structure. *Limitations, Statute of.*

In a zoning enforcement action where a landowner defended by alleging that his nonconforming uses of his property were grandfathered by virtue of the six-year enforcement limitation contained in G. L. c. 40A, § 7, the landowner did not meet his burden of proving the nature of the particular uses authorized by building permits that had previously been issued with regard to the property, and that the uses for which he sought protection were allowed by the permits. [57-61]

CIVIL ACTION commenced in the Superior Court Department on May 2, 1997.

The case was heard by *Thayer Fremont-Smith,* J.

*Brian J. Gunning* for the plaintiff.

*Thomas A. Mackie* (*Gail E. Magenau* with him) for the defendants.

MILLS, J. Raymond Moreis, a resident of Perkins Avenue in Oak Bluffs, requested the local building inspector to issue a cease and desist order to a neighboring property owner, Frank M. Fenner. See G. L. c. 40A, § 7. Moreis's complaint was that Fenner's tenant, Browning Ferris, Inc. (BFI), was using Fenner's land unlawfully for parking, maintaining and cleaning large trucks of several types; collecting and processing refuse, cans, and bottles; and other commercial uses. None of those uses, Moreis said, were permitted under the zoning by-law of

---

[1] Of the Fennco Nominee Realty Trust.

Oak Bluffs in the residential zoning district in which the Fenner land was located. The inspector refused the enforcement request, and Moreis appealed from that inaction to the Oak Bluffs board of appeals (board) pursuant to G. L. c. 40A, §§ 8 and 15. The board, apparently applying the criteria of G. L. c. 40A, § 6, concerning extension of a prior nonconforming use, found that, with specifically noted exceptions (recycling), the commercial activities complained of had been carried on for many years by a predecessor owner-operator, and that the activities (other than the recycling) were not more detrimental to the neighborhood than the historic uses. The board upheld the inspector's decision, and Moreis appealed in the Superior Court under G. L. c. 40A, § 17. Fenner's chief defense was that his use of the site was protected by the provision in G. L. c. 40A, § 7, establishing a six-year limitation on enforcement actions. Moreis prevailed in the Superior Court where, after a bench trial, a judge ordered that the board take all actions necessary to enforce the cessation of all commercial and nonresidential use of the site. Fenner appeals, arguing that (1) the judge erred in determining that Fenner's use of his property was not protected under § 7 by virtue of various building permits that had issued to him and his predecessor in title; (2) the judge impermissibly substituted his judgment for that of the board; and (3) the judge's findings of fact were clearly erroneous.[2]

1. *Background.* The Fenner property (site) consists of two adjoining lots, one with a building (building lot) and the other paved, with perimeter fencing but no building (fenced lot). The building lot, historically owned by the town and used as a school gymnasium, was sold to Everett A. Rogers in 1958. Rogers then began using the building lot (and building) for his relocated trucking business, although the land was then, and for all times relevant has been, zoned for residential use only, not permitting trucking or other commercial use. Rogers's business activities involved delivering food and beverages to local restaurants and

---

[2]We have examined the record and conclude that the facts as found by the judge that are relevant to our decision are supported by the evidence; other findings disputed by Fenner are irrelevant to the disposition of this case.

stores, rubbish collection, and the storage and maintenance of several kinds of trucks.[3]

In 1965 Rogers made application for a permit to build an addition for the purpose of "storage & garage," at a cost of $1,500. The application did not indicate whether the use of the structure would be residential or commercial, but Rogers answered "yes" to the application's question, "Will the building conform to the requirements of the law?" No permit was offered in evidence, although the town's record indicates that some building permit was issued in 1965 to Rogers at "Perkins Ave." for "additions or alterations" at a value of $1,500. There is no evidence of plans for, or the location of, the permitted work on the lot, nor is there evidence that any of the permitted work "as built" was accomplished or approved as compliant with the 1965 permit.

In 1975, Rogers applied for a building permit to build a "shelter for platform," at an estimated cost of $1,100. The "remarks" section of the application form recites, "This is just a canopy to cover existing platform." The application contains denial that the proposed work was for a building addition. As with the 1965 permit application, there was no indication as to whether the use of the structure would be residential or commercial, but Rogers answered "yes" to the application's question, "Will the building conform to the requirements of the law?" No building permit was produced. Municipal records indicate the issuance of a building permit in 1975 to Rogers at Pacific Avenue for an addition or alteration valued at $1,100. There is no evidence of plans for or location of the permitted work on the lot. As in the case of the 1965 permit, there is no evidence that the work was ever completed or accepted by the building inspector "as built." In 1979 Rogers purchased the adjoining lot (the fenced lot), which he then, without any permit or other approvals, paved and began to use for truck storage.

In 1988, when Rogers became ill, he began negotiating the sale of the site to the defendant intervener Fenner, who was in

---

[3]It is uncontested that neither lot has ever been the subject of zoning relief, and that Rogers never obtained authority to use the land for these commercial uses. Fenner now claims that such authority is consequent of the issuance of certain building permits, as discussed below.

the refuse and reprocessing business. In contemplation of the purchase, Fenner had discussions and correspondence with the building inspector (who, in 1988, was Alishan Haigazian) concerning the historic uses of the property and Fenner's intention to continue those uses and to relocate his refuse business to the site. Rogers died in 1989. That same year, Rogers's nephew, Richard Mavro, became building inspector. Fenner completed the purchase of the site from the Rogers estate, and subsequently, on July 6, 1989, Mavro, upon payment of a $55 fee, issued a building permit to Fenner, which recites, inter alia, "permit to build or alter . . . a commercial building on Pacific Ave. & Perkins to be occupied for commercial use[,] provided that [the permittee] shall in every respect conform to the terms of the application on file in this office[4] . . . [and] subject to all applicable codes and ordinances." In May of 1989, Fenner also was issued a building permit for lot 271 (the fenced lot) to "build or alter a fence . . . on Pacific Ave. . . . for storage and security . . . subject to all applicable codes and ordinances." The application for the fence permit describes "type of improvement" as "addition," and "proposed use" as "nonresidential . . . storage of trucks and equipment."

According to Fenner's testimony, in 1989 he moved his refuse business and his company's entire maintenance operation (including recycling trucks, large commercial rubbish packing trucks, and rubbish collection vehicles) to the site. The judge found that the commercial uses of the site by Rogers and Fenner (including Fenner's tenant, BFI) had never conformed to the residential zoning, nor had any form of zoning relief ever been sought. Fenner claims that his uses are grandfathered by virtue of the six-year enforcement limitation contained in G. L. c. 40A, § 7.[5] He relies upon the 1965, 1975, and 1989 building permits

---

[4]The record contains no such application. Fenner's testimony described the work encompassed by the permit as repair of the roof and sides of the building.

[5]General Laws c. 40A, § 7, second par., first proviso, as appearing in St. 1989, c. 341, § 21, states in pertinent part:

"[I]f real property has been *improved and used in accordance with the terms of the original building permit* issued by a person duly authorized to issue such permits, no action, criminal or civil, the effect or purpose of which is to compel the abandonment, limitation or modification of

and the fact that no enforcement action was sought within six years of the most recent of those permits.

The judge properly found that all of the commercial uses identified in this case were in violation of the zoning by-law. Any comparison between present and historic uses, other than those allowed by permit, is irrelevant. This is not a case concerning the extension of a preexisting nonconforming use pursuant to G. L. c. 40A, § 6. The case reduces to the question whether one or more of the four building permits brought the six-year enforcement limitation into play, thereby protecting the otherwise unlawful commercial uses. Compare *Cape Resort Hotels, Inc.* v. *Alcoholic Lic. Bd. of Falmouth*, 385 Mass. 205, 211-217 (1982) (*Cape Resort*).

*2. Discussion.* We first consider the burden of proof. Generally, in an enforcement action (whether initiated by the zoning enforcement officer or, as here, a third party) the burden is upon the complainant to show that the use or structure violates the by-law. See *Brotherhood of Alpha Upsilon, Inc.* v. *Zoning Bd. of Appeals of Bridgewater*, 15 Mass. App. Ct. 991, 992 (1983). Here, however, the landowner raises the limitation in G. L. c. 40A, § 7, as a *defense.* See *Cape Resort Hotels, Inc.* v. *Alcoholic Lic. Bd. of Falmouth*, 385 Mass. at 219 (in asserting § 7 defense, landowner had burden of showing that its structure was being used in accordance with earlier building permits). Compare *Building Inspector of Chatham* v. *Kendrick*, 17 Mass. App. Ct. 928, 929 (1983) (in defense against cease and desist order, burden was on landowner to prove prior nonconforming use pursuant to G. L. c. 40A, § 6). We hold that it is Fenner's burden to prove the § 7 defense.

We have outlined, above, some details of the four "permits" upon which Fenner claims protection. The first two permits were not placed in evidence, nor was there evidence that any

the *use allowed by said permit* or the removal, alteration or relocation of any structure erected in reliance upon said permit by reason of any alleged violation of the provisions of this chapter, or of any ordinance or by-law adopted thereunder, shall be maintained, unless such action, suit or proceeding is commenced and notice thereof recorded in the registry of deeds for each county or district in which the land lies within six years next after the commencement of the alleged violation of law" (emphasis added).

work authorized by the permits was accomplished within the terms of those permits. The record as to these permits is not assisted by plans or other documents from which the actual use or structure could be identified. The indication in the 1965 permit application that the proposed structure would be used for "storage and garage," and the 1975 application's description of a proposed "canopy to cover existing platform," do not even mention commercial use of the property. Neither permit, therefore, can serve as the basis for Fenner's § 7 defense. Compare *Lord* v. *Zoning Bd. of Appeals of Somerset,* 30 Mass. App. Ct. 226, 228 (1991) (no § 7 protection where building permits for construction of addition and garage for house in single-family district gave no indication that structure would be used as two-family dwelling).

The 1989 permits are shown in evidence: the permit for the fenced lot is dated May 19, 1989, and that for the building lot, July 6, 1989. Fenner testified that he brought his company's recycling, refuse and crushing operations, together with commercial garbage trucks, recycling trucks, residential garbage trucks, and other equipment to the site prior to the July building permit. It is also clear from his testimony that, at least as to the building lot, Fenner engaged in the objectionable uses well in advance of the July, 1989, building permit. As to the fenced lot, it is not entirely clear whether Fenner made additional use of the lot prior to the issuance of the fence permit on May 19. It is clear, however, that Rogers's use of the fenced lot began around 1979 and that he continuously parked tractors, trailers, and other commercial vehicles there for approximately ten years before the May, 1989, permit, in violation of the zoning by-law. As with the earlier two permits, the 1989 permits, although in evidence, were unaccompanied by plans or other documentary narrative as to the existing use, proposed changes, or other activity to be accomplished within the contemplation of the permits.

Section 7 of G. L. c. 40A protects, by limitation of action, *"use allowed by said permit"*[6] or "the removal, alteration or relocation of any *structure erected in reliance upon said permit. . ."*

---

[6]In its original form, § 7 protected uses *"contemplated* by said permit" (emphasis added). See G. L. c. 40A, § 22, as amended by St. 1970, c. 678,

(emphasis added). We have carefully examined the permits and permit applications, see *Cape Resort, supra* at 219; *Garabedian* v. *Westland,* 59 Mass. App. Ct. 427, 437 (2003), to see whether they allowed Fenner's commercial operations (truck storage, refuse, transfer, etc.), on one or both of the lots, within the meaning of § 7, and conclude that they do not.

The July, 1989, permit indicated that the building in relation to which the permit was issued would be "occupied for commercial use." That designation, without more, lacks the particularity required to trigger the protection of § 7. The words "commercial use," standing alone, could be read in a massively expansive way to refer to multiple nonresidential uses (e.g., incinerator, gasoline station, shopping center, garbage dump, etc.). We consider it absurd to suggest that the Legislature, in adopting § 7, would intend *"terms* of the original building permit" (emphasis added) to authorize any and all imaginable commercial uses on Fenner's property, with no greater specificity or description. See, e.g., *Cape Resort, supra* at 219. There, a hotel had operated as a lawful, preexisting nonconforming use in a residential district. At issue was the change in use of particular rooms in the hotel: a reading area had become a pub; a dining room had become a disco; part of an enclosed porch had become a game room; and a "frolic room" had become a "show lounge." After rejecting the landowner's argument that the changes continued to enjoy the protection of G. L. c. 40A, § 6 (see *Bridgewater* v. *Chuckran,* 351 Mass. 20 [1966]), the court considered the landowner's claim that a single permit to enclose a porch provided § 7 protection for "the entire present use of the hotel's ground floor." This argument was rejected by the court, which examined the present uses — and any prior building permits that might have allowed them — on a room-by-room basis. Of the varied uses for which the landowner sought protection, the court concluded that only the show lounge was protected by § 7, because the documents accompanying an

§ 1. The more restrictive word "allowed" was substituted for "contemplated" by St. 1975, c. 808, § 3. See, e.g., Webster's Seventh New Collegiate Dictionary 24, 180 (1972) ("Allow": "permit," "let." "Contemplate": "to have in view as contingent or probable or as an end or intention").

earlier permit application for an addition (which subsequently became the show lounge) "indicated very clearly that the space would include a bar, cocktail lounge, and entertainment facilities" — the specific uses in effect at the time of trial. *Cape Resort, supra* at 219. In contrast, the court concluded that a 1956 permit to enclose the porch, without evidence of the use to which the enclosed porch was put in 1956, did not meet the landowner's burden of showing that the room was being " 'used in accordance' with the permit authorizing its enclosure." *Ibid.* Similarly, in the instant matter, the July, 1989, permit for a "commercial building . . . to be occupied for commercial use" is insufficient to provide Fenner the protection of § 7.

Lastly, we consider the May, 1989, fence permit application and permit documents to determine whether, in combination, they provide § 7 protection for Fenner's use of the fenced lot. The contents of each document are detailed above. Although Fenner's permit application described the "proposed use" as "nonresidential . . . storage of trucks and equipment," the permit itself authorized Fenner only to "build or alter a fence . . . for storage and security . . . subject to all applicable codes and ordinances."

The six-year limitations period in § 7 applies to both structural and use violations authorized by a building permit. However, unlike structural violations for which no permit was obtained (which enjoy a ten-year limitations period), no such protection is afforded use violations unsanctioned by any permit. See *Lord* v. *Zoning Bd. of Appeals of Somerset,* 30 Mass. App. Ct. at 227. The May, 1989, fence permit gave Fenner permission to build a fence, and nothing more. The permit application's reference to "trucks and equipment" pertains to the lot, not the fence. The words are incidental, and superfluous to a permit application for a fence. The fact that a preexisting, unlawful, unpermitted use was incidentally described on an application to erect a fence does not, in our view, bring the unlawful use within the protection of § 7. Cf. *Cape Resort, supra* at 220 (effect of variance for parking lot was to "alleviate parking problems at the hotel, not to legalize all uses to which hotel buildings were being put[;] [t]he judge correctly refused to attribute any broader significance to the granting of [the]

variance").[7] Nor, upon examination of Fenner's trial testimony, is there any basis for concluding that his commercial activities, or Rogers's for that matter, were allowed by any permit, or undertaken consequent to the issuance of any permit. The unlawful uses simply have no relationship to the building permits under which Fenner seeks protection. Thus, in the instant matter, only the fence itself enjoys the protection of § 7. Because Fenner's use of the property was never allowed by a permit, there is no limitations period for actions to redress that violation of the zoning by-law.[8]

In conclusion, we hold that Fenner had the burden of proving the nature of the particular uses authorized by the earlier building permits, and that the uses for which he sought protection were allowed by the permits. He failed to do so. We affirm the judgment.[9]

*So ordered.*

---

[7]The fact that the Legislature rewrote § 7 to protect only uses "allowed" by a permit, rather than any use "contemplated" by a permit, see note 6, *supra*, lends further support to the view that permits should not be read expansively when considering the extent of their reach for purposes of § 7.

[8]We also observe that, in substance, the result requested by Fenner would essentially result in the rezoning of land, or effect the grant of a variance. These matters are unambiguously entrusted by the Legislature to the town meeting and zoning board of appeals, respectively. See generally G. L. c. 40A, §§ 3, 4, 5, 10.

[9]In light of the conclusion we reach, there is no merit to Fenner's argument that the judge impermissibly substituted his judgment for that of the board. The relevant facts, as properly found by the judge (see note 2, *supra*), cannot support a conclusion that Fenner's use of the property was protected by c. 40A, § 7.