TOWN OF SEEKONK *vs.* JOSEPH D. ANTHONY.

Bristol. March 3, 1959. — April 15, 1959.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, & CUTTER, JJ.

*Zoning. Permit. Equity Jurisdiction,* Zoning. *Estoppel.*

In a suit in equity by a town against the owner of a sand and gravel plant to enjoin the carrying on of a "ready-mix" concrete business in a residential zoning district in alleged violation of the town's zoning by-law, where it appeared that prior to the adoption of the by-law there were on the premises a small platform for the storage of cement in bags, wooden bins for storage of sand and gravel, and a gasoline driven elevator "bucket line" for conveying sand and gravel to the bins, and dump trucks passed beneath the bins and took away dry sand and gravel and cement in bags for delivery to customers, and that after adoption of the by-law elevators were operated by electricity, the wooden platform and bins were replaced by steel bins in which sand and gravel and cement in bulk were stored and then mixed and from which the mixed material was lowered into large trucks each containing a revolving drum and a water tank for adding water to the mixture during transit or upon delivery to customers, and small buildings were erected to heat the mixture in winter and for other purposes, the plant was so changed and enlarged after the adoption of the by-law that it became different in kind from the original plant and was not entitled to the protection afforded to preëxisting nonconforming uses and structures under the by-law. [53–54]

A provision of a zoning by-law stating that a limitation of height imposed by the by-law on buildings in residential zoning districts of the town should "not apply to . . . accessories usually carried above the roof" of buildings permitted such accessories to go above the height limit only when placed on buildings allowed by the by-law in residential districts and did not permit such accessories to go above the height limit when placed on buildings replacing buildings formerly used for nonconforming uses. [54–55]

A permit issued by the building inspector of a town to erect certain structures on premises of a sand and gravel plant in a residential zoning district did not estop the town from seeking equitable relief compelling removal of the structures as having been erected in violation of the zoning by-law. [55]

BILL IN EQUITY, filed in the Superior Court on February 17, 1954.

The suit was heard by *Smith*, J.

*Daniel G. Rollins,* for the plaintiff.

*Ellsworth A. Hathaway,* for the defendant.

CUTTER, J.   The town seeks to have Anthony[1] enjoined from carrying on a "ready-mix" concrete business, in alleged violation of the town zoning by-law, on 5.67 acres of land (the Greene lot) in Seekonk situated within an "A Residence" district.   The bill, as amended, sets out that "structures existing on . . . [the] land at the date . . . zoning by-laws became effective, have subsequently been altered to an extent which amounts to reconstruction, extension, and structural change" and to "provide for . . . use in a manner substantially different from the use . . . before . . . alteration."   The trial judge made comprehensive findings of fact, which he later adopted as a statutory report of material facts.   A final decree was entered dismissing the bill.   The town appealed.   The evidence is reported.   The scope of our review is that stated in *Willett* v. *Willett,* 333 Mass. 323, 324, *Zelman* v. *Killion,* 337 Mass. 666, 669, and *Linse* v. *O'Meara,* 338 Mass. 338, 345.   Except as otherwise noted, the facts stated are as found by the trial judge.

The town's zoning by-law (the principal applicable provisions of which are set out in the margin[2]) became effective

---

[1] Prior litigation between the same parties relating to a much larger parcel adjacent to that here involved is reported in *Seekonk* v. *Anthony,* 328 Mass. 236.

[2] Section V.   "This by-law . . . shall not apply to existing . . . structures, nor to the existing use of any . . . structure, or of land to the extent to which it is used at the time of the adoption of this by-law.   It shall apply to any change of use thereafter or to the . . . alteration of building or structure for a purpose, or in a manner substantially different from the use to which it was put before alteration, or for its use for the same purpose to a substantially greater extent . . . .   No [b]oard shall permit a non-conforming use to be changed, unless changed to a more restrictive use, or, changed to any specified use not substantially different in character nor more detrimental or objectionable to a neighborhood. . . ."

Section VIII.   "In all residence districts no building shall be erected or altered to exceed . . . thirty-five . . . feet in height . . . .   The limit of height in feet shall not apply to chimneys, ventilators, skylights, tanks, bulkheads, or other accessories usually carried above the roof, nor to towers or spires of churches, if such features are in no way used for living purposes. . . . This by-law shall be enforced by the [b]oard of [s]electmen through the [b]uilding [i]nspector. . . .   The [b]uilding [i]nspector shall issue no permit for the erection or alteration of any building, . . . plans . . . and intended use . . . of which are not in all respects in conformity with . . . this by-law. . . .   Any building existing at the time this by-law is adopted and not

on December 26, 1942. Anthony, at least as early as April, 1942, had been removing from the Greene lot gravel, there processed. He had obtained in 1940 from Greene, its owner, an option to buy the lot, with the privilege of removing sand and gravel in the meantime, and purchased the lot in 1947.

He put up on the lot a building ten feet by twelve feet for telephone, storage, and office purposes. A crusher and a sand and gravel plant were assembled and a platform, mentioned below, was built "on which bags of cement were stored . . . and . . . covered with a canvas." Wooden bins were "erected upon wooden posts, with the base . . . sufficiently high . . . to permit trucks to pass underneath and be loaded with . . . ingredients used in making" concrete. From "the processing plant . . . [came] different grades of gravel and sand. A power shovel and loader picked up these . . . and put them in the bins and the trucks . . . underneath were loaded, the material being dumped into the compartments in the truck" through the base of the bins. Bags of cement were opened and placed on the top. Anthony's testimony shows that this was done from the small platform, about ten feet by twenty-five feet, where the cement bags were stored.

The judge found that "the different ingredients . . . were then mixed," although this finding seems somewhat in conflict with Anthony's own testimony which indicated that any mixing consisted of putting the materials into the trucks in horizontal layers in dry form. In any event, the loaded material was "taken away for delivery to the customer in dump trucks." This loading method, with such mixing of the ingredients as occurred, "was in operation for several months prior to the adoption of the zoning [by-]law."

In late 1941 or early 1942, a "make shift elevator or 'bucket line'" was built. Driven by a gasoline engine, this

conforming to the provisions of [s]ection eight . . . may, if destroyed, be rebuilt on or within the same foundation lines and for the same purpose."

Under § III of the by-law, the use being made by Anthony of the premises was not within the scope of the uses permitted in an "A Residence" district. An accessory use or building was defined in § II as a "use of . . . a structure or building customarily incident to the use of land or building to which it is an accessory."

arrangement replaced the power shovel in loading. "The plant . . . thus constructed continued in operation . . . and in 1953 the wooden bins . . . used for the . . . gravel and sand, had fallen into disrepair." The town building inspector on April 7, 1953, issued Anthony a permit "to build or alter a building . . . to be occupied as steel bins . . . about 15 by 15 over-all . . . . [T]he defendant erected steel bins set upon eight concrete posts." A worn out conveyer belt was replaced. Thereafter cement "was brought to the plant in . . . [airtight] trucks [in bulk instead of in bags] and dumped into a bin which . . . [Anthony] had been permitted to erect, by means of a 'bucket elevator.'" The gravel and sand were stored in a separate bin. "[A] tube from the cement bin leads into the bin storing the . . . [gravel and sand] and the entire mixture is . . . lowered into a truck" containing a revolving drum and a water tank, "so constructed that it may be activated during the transit of the material and . . . water . . . added to the mixture of stone, gravel, and cement. Sometimes the material [now] leaves the plant . . . dry . . . ; at other times . . . water is added during transit . . . to the customer, and at other times the operation is completed at the point of delivery." There was testimony that the new operation resulted in a very much larger volume of truck traffic than had previously existed and that much larger trucks were used.

"After 1942 a small building was erected where the cement was dumped for transmission by the elevators to the bin to prevent dust from scattering" and two other small buildings were built. The testimony shows that one of these was for heating the mixture, which Anthony stated he "couldn't handle . . . before in the wintertime." These small buildings, the judge found, were "of insignificant size."

Anthony's business "has increased in volume but is now concentrated in a smaller area . . . in closer proximity to the mechanical plant." Electricity instead of a gas engine now operates the elevator bucket line. There was testimony that facilities for weighing the cement have been added.

To one of the steel "bins replacing the . . . wooden bins . . . there is attached an elevator that carries the bulk cement into the bin. From the foundation to the top of the . . . bins is 34 feet 1 inch." There is a belt "17 feet 11⅓ inches above the top of the bin, and above this belt there is an electric motor . . . braced to stop vibration, . . . 4 feet 8 inches above the top of the belt. The total height from . . . ground level . . . is 56 feet, 8 inches."

The judge, in what we interpret to be ultimate findings based upon the subsidiary findings just outlined, concluded so far as here material (a) "that the business as presently conducted is the same as that . . . prior to . . . the zoning [by-]law, and that while it has . . . greater volume, it has not been extended by uses differing substantially" from its pre-zoning operation; "modern mechanism made necessary by the increased volume . . . facilitates . . . the business but does not change its . . . original character"; (b) that, because of the hazy recollection of witnesses, he could not find the dimensions of the worn out wooden bins; (c) that the steel bins (apart from motor braces and elevators) did not exceed the 35 foot limit imposed by the zoning by-law and that the braces, belt, and elevator "are accessories without which the bins would be without practical value"; (d) that the post-1942 small buildings are buildings customarily on land used in this type of business; and (e) "that there has been no change of use, . . . alteration of . . . structures for any purpose . . . substantially different from its [prior] use . . . or for its use to a substantially greater extent than that existing at the time of the zoning by-law."

The testimony, including that of Anthony, described the changes from pre-zoning by-law days in somewhat greater detail than did the trial judge. Examination of the testimony confirms various inferences which we draw from the judge's subsidiary findings and which differ from the conclusions reached by the judge upon the same basic facts.

The new 1953 structures turned a makeshift set of arrangements for furnishing to dump trucks in one place all the ingredients of concrete into a modern plant using more

elaborate fixed facilities for use in connection with more complicated vehicles than in 1942. The old arrangement used cement only in bags whereas the new use of bulk cement resulted in turning the Greene lot in effect into a substantial supply terminal for cement mixer trucks. There was not merely a permitted increase in the volume of business done in an existing plant. See *Building Commr. of Medford* v. *McGrath,* 312 Mass. 461. There was change in and enlargement of the plant which made it "different in kind in its effect upon the neighborhood." See *Inspector of Bldgs. of Burlington* v. *Murphy,* 320 Mass. 207, 210, and cases there cited, especially *Marblehead* v. *Rosenthal,* 316 Mass. 124, 128 (where a small local tailor shop was held improperly expanded into a mechanized dry cleaning establishment employing seventeen people). See *Adamsky* v. *Mendes,* 326 Mass. 603, 605; *Everett* v. *Capitol Motor Transp. Co. Inc.* 330 Mass. 417, 420–421; Rhyne, Municipal Law, §§ 32–28, 32–30. See also *Connors* v. *Burlington,* 325 Mass. 494, 495–496. Cf. *Cochran* v. *Roemer,* 287 Mass. 500, 508–509 (which has been recognized as resting upon the special statutory provisions applicable in Boston; see *Inspector of Bldgs. of Burlington* v. *Murphy,* 320 Mass. 207, 109); *Paul* v. *Selectmen of Scituate,* 301 Mass. 365, 370–371. There was here in total more change than the mere use of either improved and more modern equipment within an existing building, or of more modern movable equipment outdoors. Cf. *Wayland* v. *Lee,* 325 Mass. 637, 642–644.

The new bin for cement with its mechanical apparatus extending above thirty-five feet from the ground was a violation of § VIII of the by-law. The judge concluded that these items were permitted as accessories to the new steel bin used for cement. We construe § VIII as permitting such accessories to go above thirty-five feet only when placed on residence and municipal buildings, schools, and churches allowed by the by-law to be built within an "A Residence" district. We find no suggestion in the by-law that structures replacing others formerly used for nonconforming uses are to be permitted to have accessories more than thirty-five

feet from the ground. See somewhat comparable situation discussed in *Building Inspector of Falmouth* v. *Gingrass*, 338 Mass. 274, 276.

Under § V, no board was to permit a nonconforming use to be expanded or changed to one "more detrimental or objectionable to a neighborhood," and under § VIII, the building inspector had no authority to issue any permit for a building not in conformity with the by-law. The permit granted to Anthony did not create an estoppel against the town to enforce the by-law. If the structure "was a violation of a . . . zoning by-law, no permit could legalize it." *Inspector of Bldgs. of Burlington* v. *Murphy*, 320 Mass. 207, 210. See *Meadows* v. *Town Clerk of Saugus*, 333 Mass. 760, 764–765; *Collins* v. *Boston*, 338 Mass. 704, 709.

The replacement of the wooden platform for loading and storing cement by a steel bin and accessories, and the additions of wholly new small buildings and a heating plant to permit winter use, were violations of the precise terms of the zoning by-law. See *Planning Board of Reading* v. *Board of Appeals of Reading*, 333 Mass. 657, 660–661. They were not temporary, expendable structures like that considered in *Manchester* v. *Leahy*, 336 Mass. 158, 160.

On the grounds stated, the judge's conclusions (apart, possibly, from his inability to find that the steel bins exceed in size the old wooden bins) are not justified by the evidence or by his own subsidiary findings. Accordingly, the decree is reversed. A new decree is to be entered (1) requiring Anthony to remove entirely (a) the steel bins to the extent necessary to restore the aggregate bin capacity for sand and gravel to no more than it was in 1942 (a matter about which there must be further hearing and as to which Anthony has the burden of proof), (b) all parts of any of the steel bins and all mechanical equipment and accessories which reach to a greater height than is permitted by the zoning by-law, and (c) all the small buildings placed on the Greene lot after 1942; and (2) enjoining him (a) from storing bulk cement on the Greene lot, (b) from distributing cement on or from the Greene lot otherwise than in bags and in the manner em-

ployed by him prior to the adoption of the zoning by-law, (c) from using any of the steel bins or accessories for the storage of anything other than sand and gravel, and (d) from using the Greene lot for the delivery or sale of sand, gravel, and cement to mobile cement mixers, or otherwise than to dump trucks and vehicles of the size and general type used in 1942 and in the manner employed by him prior to the adoption of the zoning by-law.

*So ordered.*