MARY KREGER & others *vs.* PUBLIC BUILDINGS
COMMISSIONER OF NEWTON.

Middlesex.    December 5, 1967. — February 6, 1968.

Present: WILKINS, C.J., WHITTEMORE, KIRK, SPIEGEL, &
REARDON, JJ.

*Zoning,* Wholesale distributing plant, Nonconforming use.    *Words,*
"Wholesale business."

Where it appeared that the operator of a retail fuel oil business, who had
previously distributed oil from the three tanks on his premises into his
trucks only for delivery to his consumer customers, entered into an
arrangement with a petroleum company whereby it delivered oil to
his tanks and its many retail distributor customers filled their tank
trucks therefrom and the company paid the operator a commission
based on its sales for the use of his tanks, and that as a result of the
arrangement the quantity of oil passing through the tanks increased
greatly and was largely delivered to the company's customers, it was
held that the new use of the premises was as a distribution plant for
a wholesale oil business [623], and constituted a change in kind from
the previous use for zoning purposes    [627].

Reading together the provisions of a zoning ordinance respecting per-
mitted uses in business districts and permitted uses in less restricted
limited manufacturing districts, particularly the classifications "Whole-
sale business or storage warehouse" as a permitted use in a business
district and "Wholesale distribution plants" as a permitted use in a
limited manufacturing district, the use of premises in a business dis-
trict as a distribution plant for a wholesale fuel oil business was not
a permitted use.    [624–625]

PETITION for a writ of mandamus filed in the Superior
Court on June 11, 1965.

The case was heard by *Kalus,* J.

*Lawrence D. Shubow* for the petitioners.

*Theodore L. Tillotson* for the intervener.

*Charles H. Morang,* Assistant City Solicitor, for the re-
spondent.

WHITTEMORE, J.    This is a petition for a writ of man-
damus to require the public buildings commissioner of
Newton to enforce a zoning ordinance and cause the inter-
vener, Luther Paul Co. (Paul), to cease a use of premises at
35–47 Paul Street, in a Business B district, alleged to violate

the ordinance. The judge made findings, ruled that Paul was not violating the ordinance, and ordered the petition dismissed. The record includes designated parts of the transcript of evidence. At issue is whether the ordinance expressly permits the new use and, if not, whether the new use can be supported as an enlargement without essential change of a nonconforming or permitted use.

Paul has done business at the locus since 1891. Its business, for the relevant period prior to a change in 1963, had become "the storage and sale of fuel oil and service to consumer customers." It had and has three fuel storage tanks found to hold 58,000 gallons but according to the evidence having a present total effective capacity of 56,000 gallons.

In 1963 Paul entered into an arrangement with Northeast Petroleum Company of Chelsea (Northeast) whereby certain of Northeast's retail distributor customers fill their fuel oil tank trucks at the locus and Northeast delivers the oil for its customers and the oil for Paul into Paul's three tanks. Paul is compensated for the use of its tanks by a commission based on Northeast's sales. Since 1963 the "sale and delivery" of oil at the locus has been primarily (eighty-eight per cent to ninety per cent) to Northeast's customers. Paul's clerical office is on Union Street, some distance from the locus. The volume of the oil received and delivered is recorded at the locus. Paul controls there the "degree day card deliveries." Paul reports daily to Northeast the meter readings, the inventory, and the gallons delivered both to Paul and to others. Northeast bills from Chelsea.

The 1963 change was followed by a very large increase in the amount of oil passing through the tanks. Paul's deliveries in December, 1962, for its own customers totaled 163,342 gallons. In December, 1965, the deliveries totaled 1,381,104 gallons of which 144,139 were for Paul's customers. About forty companies are approved to take fuel; over a thirty-four months period about eighty-seven per cent of the total was taken by the ten largest users including Paul.

We rule that the new use of the premises is as a distribution plant for a wholesale oil business. *Commonwealth* v.

*Greenwood,* 205 Mass. 124. See *Cochran* v. *Roemer,* 287 Mass. 500, 508; *Evansville* v. *Gaseteria, Inc.* 51 F. 2d 232, 237 (7th Cir.). The customers of Northeast who fill their trucks at the plant are undoubtedly retailers. But the oil is not in Paul's tanks as a part of their business.

We turn to the ordinance (§ 25–10) to determine whether this wholesale use is among the specified, permitted uses. These include, as a use permitted in Business A districts, "Stores, salesroom or showroom for the conduct of retail business, but not for the sale of motor vehicles." [1] Even if this provision permitted tank storage for a retail business, it would not support the present wholesale operation.

Another category permitted by § 25–10[2] is "(a) . . . (1)

---

[1] The phrase "stores . . . for the conduct of retail business" is to be read with a provision of the more restricted Business AA districts, authorizing in those districts "(1) Offices for professional purposes or for business purposes, excluding the retail sale of tangible personal property from a stock of goods on the premises."

[2] "Sec. 25–10. Same — Business B districts.

(a) In business B districts, . . . no building, structure, land or parts thereof shall be used except for one or more of the following purposes:

(1) Wholesale business or storage warehouse.

(2) Bowling alley or other place of amusement or assembly.

(3) Job printing, offices of contractor, builder, electrician or plumber and similar enterprizes, together with such storage buildings as are necessarily appurtenant thereto.

(4) Motor vehicle salesrooms; provided, that, except as provided in paragraph (b) (4) of this section, no vehicles are displayed or stored out-of-doors and that all advertising signs are affixed to or within buildings.

(5) Telephone central office or exchange.

(6) Any uses and accessory purposes permitted in the business A districts which do not require the permission of the board of aldermen.

(b) In business B districts the board of aldermen may give permission ·. . . for the use of buildings, structures or land for one oɪ more of the following purposes:

(1) Parking lots, business stable, ·public garage or public stable, gasoline selling or service station, garage repair shop, but not for a motor vehicle repair shop.

(2) Public or private dump or place of depositing abandoned property or refuse.

(3) The removal of sod, loam, subsoil, sand or gravel from the premises for the purpose of the sale thereof.

(4) Areas for outside storage, display and sale of motor vehicles . . . [provisos omitted].

(5) Automobile laundry.

(6) Other uses similar or accessory to those authorized by this section which are not injurious to the neighborhood as a business B district.

(c) In addition to the foregoing uses, such industry, trade and light manufacturing may be carried on in a business B district as is proper and usual in connection with such uses and as part of a business authorized or permitted under the provisions of this section, such business being carried on in the same building or on the same premises as such industry, trade or light manufacturing; [other exception omitted]."

Wholesale business or storage warehouse." The judge, quoting this section, ruled that if Paul's present use is deemed to be wholesale rather than retail it is a use specifically permitted by the ordinance. In the light of the entire ordinance, we think this conclusion is unjustified.

The context indicates certain limitations on the breadth of the words "wholesale business." Section 25–11 states what is permitted in Limited manufacturing districts. The categories include the uses permitted in Business B districts (except most residences) and, among a number of other uses, "Wholesale distribution plants." The structure of the use sections of the ordinance shows an intent specifically to name as permitted only those uses not already authorized in a more restricted section and included by the reference back to that section.

We need not determine all that is included in the rather cryptic phrase "wholesale business or storage warehouse." We think in any event it does not include the use of premises for the "distribution plants" of a wholesale oil business. Assuming that subsection (a) (1) of § 25–10 permits two different categories of business (that is, [1] wholesale business and [2] storage warehouse) the association of the categories in the one specification suggests that not every type or aspect of wholesale business is permitted. This tends to confirm the other indications of §§ 25–10 and 25–11 read together that that part of a wholesale business which is the operation of a distribution plant is not permitted in Business B districts. Section 25–11[3] by implication shows that

---

[3] Permitted uses in § 25–11 include:

"Any uses and accessory purposes permitted in the business 'B' districts as listed in section 25–10 (a) except residential structures or uses of any type, other than accommodations for a watchman or caretaker in connection with a business or manufacturing use.

Bakery, commercial or wholesale.
Bottling works (except for alcoholic beverages).
Building materials sales yard and storage building.
Canvas products fabrication and sales.
Carpenter or woodworking shop.
Casting light weight and nonferrous metals (no noxious fumes).
Feed and seed store.
Food processing, wholesale (except for meat, fish, vinegar, yeast, fat).

many wholesale businesses that involve manufacture are excluded from the phrase "wholesale business" in § 25–10.

At the locus the distribution is the dominant aspect, not the storage, so that § 25–11 is apt. The classification for zoning purposes of an oil distribution station with light manufacturing appears logical. The conduct of the station involves the operation of pumps. There is on Paul Street, in common speech, a "plant," that is, tanks to hold oil, with necessary valves and vents, pumping machines, meters, and loading and unloading bays for the oil trucks. The other uses specifically listed in § 25–11 bear a closer general resemblance to the operation now conducted at the locus than those in § 25–10.

Assuming, as do the parties, the legality of Paul's prior use, however based, the judge ruled that there had been no essential change in use. We disagree. *Burlington* v. *Dunn*, 318 Mass. 216, 223–224. *Inspector of Bldgs. of Burlington* v. *Murphy*, 320 Mass. 207, 210 (review of cases). *Seekonk* v. *Anthony*, 339 Mass. 49, 52–54. *Brady* v. *Board of Appeals of Westport*, 348 Mass. 515, 523–524, and cases cited. *Bridgewater* v. *Chuckran*, 351 Mass. 20, 23–24. Compare *Cochran* v. *Roemer*, 287 Mass. 500, 507 (excluded by later cases [see *Seekonk* case, *supra*] as a general authority inasmuch as it arose under special statutes applicable to

Glass fabrication and installation.
Ice manufacture and storage.
Laboratory, research.
Laundry, cleaning and dyeing establishment.
Machine shop (excluding presses over 10 tons), plumbing and blacksmith shop.
Metal fabrication light (such as sheet metal, ducts, gutters and leaders). Molding, shaping or assembly from prepared materials (including repairs) of boxes, ladders, staging, toys, stationery, novelties, paper boxes, toilet preparations, drugs, perfumes, flavoring extracts, medical and hygienic appliances, clothing, textiles, hats, leather and sporting goods, mattresses, store and office equipment, house, office, theatre, playground equipment, signs, musical instruments, art goods, industrial models, tools, appliances, electrical goods.
Optical and scientific instruments, jewelry manufacturing.
Paint store and sign painting shop.
Printing, publishing and reproduction establishments.
Ship building, small boat building, yards for storage and repair.
Veterinary, dog-cat hospital, kennel, bird store or taxidermist.
Wearing apparel, fabrication and processing.
Wholesale distribution plants."

Boston); *Wayland* v. *Lee*, 325 Mass. 637, 643–644; *Building Commr. of Medford* v. *McGrath*, 312 Mass. 461; *Medford* v. *Marinucci Bros. & Co. Inc.* 344 Mass. 50, 60.

For zoning purposes, there was a change in the kind of use. Although the physical use of the tanks is the same, that is, the temporary storage of oil on its way into retailers' tank trucks, the business in the course of which the oil is stored and distributed is different. The express provision in the ordinance for "wholesale distribution plants" in limited manufacturing districts is a declaration that such activity is significant for zoning classification. The new wholesale use predominates. Indeed, until Paul fills its own trucks it would seem that all the oil is Northeast's, being distributed by the use of tanks rented from Paul.

We need not decide whether every addition to a retail operation of some wholesale business would overload a nonconforming or other legal use. Here the businesses are different in an aspect with which the use regulations in the zoning ordinance are directly concerned, and there has resulted a significant increase in use. Prior to 1963 the distribution was only into Paul's trucks to deliver less than 200,000 gallons a month. Beginning in 1963 the distribution into the trucks of a number of Northeast's customers was six or seven times as large. To supply nearly 1.4 million gallons of oil in a month through these tanks holding 56,000 gallons appears to mean that they must be refilled about twenty-five times.

It is beside the point that under our many cases this would have been protected had it resulted merely from the growth of Paul's retail business without expansion of plant. The increased activity with the change to a wholesale business shows that the change has been substantive.

The order for judgment is reversed. An order shall enter requiring the public buildings commissioner to enforce the ordinance in accordance herewith.

*So ordered.*