CAROLYN M. VOKES & another[1] vs. AVERY W. LOVELL, INC.
(and a companion case[2]).

Plymouth. June 14, 1984. — August 17, 1984.

Present: GREANEY, C.J., BROWN, & PERRETTA, JJ.

Zoning, Nonconforming use or structure, Enforcement, Building permit,
    Building inspector, Appeal to board of appeals, Timeliness of appeal.
    Permit. Jurisdiction, Zoning enforcement.

Failure of a town building inspector to reply within the fourteen days allowed
    by G. L. c. 40A, § 7, to a request, made under that statute, for enforce-
    ment of the zoning by-law did not amount to a constructive denial of
    the request. [475-480]
A town building inspector's written response to a request under G. L. c. 40A,
    § 7, that he enforce certain provisions of the town's zoning by-law,
    created the appealable decision contemplated by G. L. c. 40A, § 8, and
    fixed the date from which to measure the thirty-day appeal period pro-
    vided in G. L. c. 40A, § 15. [479-480]
The period within which parties aggrieved by the decision to issue a building
    permit might appeal to the town's board of appeals began to run at the
    time of the building inspector's written denial of the parties' request that
    he halt allegedly unlawful construction from going forward under color of
    the permit, and not at the time of issuance of the permit. [480-483]
On an appeal from a decision of a town's board of appeals upholding the
    issuance of a building permit for construction of a second garage on premises
    occupied by a cesspool business being conducted as a protected nonconform-
    ing use in a residential zone, the judge properly concluded that the construc-
    tion of the garage would be an unlawful expansion of a nonconforming
    use, in violation of the zoning by-law. [483-485]
On appeal from a decision of a town's board of appeals with respect to a re-
    quest under G. L. c. 40A, § 7, for enforcement of the zoning by-law,
    the judge was warranted in finding that a certain corporation, which had
    been conducting a cesspool business as a protected nonconforming use
    in a residential zone, had expanded its business by conducting on its
    premises a trucking business in connection with work as a general con-

[1] James Boucher.

[2] The companion case is between the same parties.

tractor and excavator, and the judge correctly ruled that this use was not permitted by the corporation's 1965 zoning variance and thus was beyond the scope of the town's 1975 zoning by-law. [485-486]

The judge in a zoning enforcement proceeding, after determining that a second garage on certain premises would exceed the permissible scope of a protected nonconforming use, properly declined to order removal of the garage, where the record did not establish that it could not be put to any lawful use or otherwise made to conform to the town's zoning by-law. [486-487]

The operator of a cesspool business, which was conducted in a residential zone as a protected nonconforming use, should not have been enjoined from allowing any eighteen-wheel vehicles on its premises, where facts found by the judge indicated that such vehicles had been used for making deliveries to the premises since the inception of the defendant's business. [487]

CIVIL ACTIONS commenced in the Superior Court Department on February 17, 1982.

The cases were heard by *Keating,* J.

*Edward W. Kirk* for Avery W. Lovell, Inc.

*Robert E. Galvin* for the plaintiffs.

GREANEY, C.J. The defendant, Avery W. Lovell, Inc. (Lovell), appeals from judgments of the Superior Court enjoining Lovell from (a) garaging or maintaining eighteen-wheel vehicles or allowing such vehicles on its property and (b) using a garage for the storage of commercial vehicles and equipment. The appeals have been consolidated. The questions argued are whether the Superior Court had jurisdiction over the cases, and if so, whether it decided them correctly.

We state the facts pertaining to the jurisdictional issues. Lovell is in the business of installing and maintaining septic tanks and cesspools with its base of operations at 789 Mayflower Street in Duxbury. The property is located in a residential zone. Lovell conducted its business pursuant to a variance granted by the board of appeals of Duxbury (board) in 1965 which permitted it (1) to conduct, in "a residential district," a "cesspool business, both as to the maintenance of the same and the construction of new cesspools," and (2) to construct "a garage to store [its] equipment under cover." In 1975, the

town adopted a new zoning by-law. By reason of art. 106 of the by-law, Lovell's operations became a nonconforming use. The plaintiffs live on Mayflower Street in the immediate vicinity of Lovell's business.

In early 1981, Lovell inquired of the board whether a special permit would be necessary under the by-law for the construction of a second garage on its Mayflower Street property. On May 15, 1981, the board issued a memorandum to the building inspector stating that a special permit was unnecessary. On June 22, 1981, the plaintiffs, and other neighborhood residents, wrote to the building inspector complaining about the parking of large flatbed trucks and "other long trailer trucks" on Lovell's property.[3] The building inspector did not reply to the letter.

On July 10, 1981, the building inspector issued a building permit granting Lovell permission to construct a fifty by fifty-five foot second building for the "storage of vehicles." The building inspector's decision to grant the permit was not appealed to the board.[4]

---

[3] This letter read as follows:

"We, the undersigned residents of Mayflower St., Lincoln St., and vicinity, wish to protest the parking of large flat bed, and other long trailer trucks at The Avery Lovell Pumping business, on Mayflower St., The name on the trucks is Franc[e]sco's Trucking. These trucks have been parking for over a year, at Lovell's. Several of us have complained to [a local official] who said he talked to Mr. Lovell, and that Mr. Lovell denied that they were there. We have pictures to support our claim. These large trucks are a hazard to this residential area. They are much too long to negotiate the turn onto Lincoln St., and we have all seen several near accidents, because cars coming up Lincoln St., toward Mayflower, come around a curve and cannot see the trucks until they are halfway out-blocking the whole street. There have also been many close calls with children on bicycles, for the same reason. In addition, these trucks disturb the peace, by often leaving Lovell's as early as 4:30 A.M., and as late as 10:30 P.M. We request that this practice of parking these trucks, or any other large, noisy trucks, such as these, be discontinued immediately! This is a residential neighborhood, and they constitute a danger. We would like action on this matter before the trucks are responsible for some terrible accident."

[4] The record does not clearly indicate the dates when persons who might have been aggrieved by the building permit learned of its issuance. As to the plaintiff Vokes, it appears, at one point in the record, that she knew on

On October 19, 1981, after engaging a lawyer, the plaintiffs, in two letters, requested that the building inspector (1) issue a "stop order" prohibiting Lovell from operating and maintaining eighteen-wheel gravel trucks and flatbed trailers, and (2) issue a "stop order" on the building permit granted Lovell on July 10, 1981.[5] The building inspector did not respond to the letters within fourteen days. He did, however, reply in a letter dated November 18, 1981, in which he declined both requests for enforcement.[6]

---

July 7 that the building permit was about to issue. At another point, however, she testified that she was led to believe by the building inspector and the chairman of the board that the permit would not issue until the board had held a hearing on its legality. She further testified that she was advised that a meeting of the board held prior to July 10 would not concern itself with the permit. There is no indication in the record of when the plaintiff Boucher learned of the permit's issuance.

[5] The letter from plaintiffs' counsel to the building inspector concerning the building permit read as follows:

"In accordance with Article 900 of the Protective By-law of the Town of Duxbury and in conformity with Massachusetts General Laws, Ch. 40A, Sec. 7, I hereby request that you issue a STOP ORDER on Building Permit No. 8056 issued July 10, 1981, to Avery W. Lovell, Inc. on property located at 789 Mayflower Street, in Duxbury, being Parcel 090-029-002 on the Assessors' Map.

"The basis for the violation is the construction of a commercial building in a residential zone without a Variance (see section 402-2) and the lack of a Special Permit for approval of the Site Plan.

"A previous Variance granted to Avery W. Lovell is Case # 65-21 in which a petition for a Variance was approved on October 1, 1965, to construct and maintain a 6-stall garage for the storage and maintenance of commercial vehicles and equipment. This Variance does not grant permission for the further construction of commercial buildings or the expansion of the business on the site without a new hearing."

The letter from plaintiffs' counsel concerning the use of eighteen-wheel vehicles was similar in content and directed the building inspector's attention to four provisions of the Duxbury zoning by-law which the plaintiffs claimed were being violated by Lovell's use of the vehicles.

The reference to "stop orders" in the letters is in keeping with art. 902 of the Duxbury zoning by-law, which makes such a request the initial step in the enforcement process.

[6] The building inspector's letter of November 18, 1981, expressed the views that eighteen-wheel trucks had always been involved in Lovell's business and that "the trucks are [not] a zoning problem that should be under my control as a zoning officer."

On November 19, 1981, the plaintiffs appealed from the building inspector's decision to the board. On January 14, 1982, the board held a hearing on the appeal and also heard Lovell's argument that the board lacked jurisdiction. On February 1, 1982, the board filed a written decision with the town clerk in which it stated that it had "no jurisdiction to hear the issue of the building permit as the appeal appears to be untimely." While the board's decision is a bit unclear, it also appears that the board believed that it lacked jurisdiction to hear the appeal pertaining to Lovell's use of eighteen-wheel vehicles. Nevertheless, the board agreed to decide the merits "in order that the [t]own, the parties and the public may have the benefit of our opinion." The board upheld both decisions of the building inspector.

On February 17, 1982, the plaintiffs filed two complaints in the Superior Court alleging that they were aggrieved by the board's decision. The complaints sought (a) to enjoin Lovell from maintaining and using eighteen-wheel vehicles on its property and from using the second garage built pursuant to the permit in violation of the by-law; (b) orders directing the building inspector to compel removal of the garage and prohibiting Lovell's use of eighteen-wheel vehicles; and (c) a further order confining Lovell's operations to the level of nonconforming use permitted by the 1965 variance. Lovell filed motions to dismiss both actions on the ground that the Superior Court lacked jurisdiction. A judge of the Superior Court denied Lovell's motions and considered the cases on their merits. He concluded that the board had erred and entered the judgments described earlier.

1. Resolution of the jurisdictional questions requires examination of the pertinent provisions of §§ 7, 8, and 15 of G. L. c. 40A.[7]

---

With reference to the building permit, the building inspector denied the request for a stop order because "the construction of [the] storage building on Mr. Lovell's property is not a *substantial extension of* the non-conforming *use*" (emphasis in original).

[7] All references in this opinion are to the provisions of the present Zoning Act, as appearing in St. 1975, c. 808, § 3. When the prior Act is referred to, it will be described as the prior c. 40A.

The building inspector in Duxbury is the officer charged with enforcement of the Duxbury zoning by-law. Section 7 of G. L. c. 40A provides that the building inspector "shall notify, in writing, the party requesting . . . enforcement [of the zoning by-law] of any action or refusal to act, and the reasons therefor, within fourteen days of receipt of [a] request" for enforcement. Under § 8 of G. L. c. 40A, a person aggrieved "by reason of his inability to obtain . . . enforcement action" has a right of appeal to the permit granting authority, here the board. Under § 15 of c. 40A, any such appeal must be taken "within thirty days from the date of the order or decision which is being appealed." The language of the proviso in the second paragraph of § 7, however, establishes a six-year limitations period for actions seeking to remedy zoning violations arising out of alleged unlawful activities conducted pursuant to an "original building permit."[8]

Lovell urges a strict construction of these statutes. As to the dispute over the eighteen-wheel vehicles, Lovell argues that the building inspector's failure to respond by July 6, 1981, the fourteenth day following the plaintiffs' June 22 letter, consti-

---

[8] The second paragraph of § 7 reads as follows:

"No action, suit or proceeding shall be maintained in any court, nor any administrative or other action taken to recover a fine or damages or to compel the removal, alteration, or relocation of any structure or part of a structure or alteration of a structure by reason of any violation of any zoning by-law or ordinance except in accordance with the provisions of this section, section eight and section seventeen, provided, however, if real property has been improved and used in accordance with the terms of the original building permit issued by a person duly authorized to issue such permits, no action, criminal or civil, the effect or purpose of which is to compel the abandonment, limitation or modification of the use allowed by said permit or the removal, alteration or relocation of any structure erected in reliance upon said permit by reason of any alleged violation of the provisions of this chapter, or of any ordinance or by-law adopted thereunder, shall be maintained, unless such action, suit or proceeding is commenced and notice thereof recorded in the registry of deeds for each county or district in which the land lies within six years next after the commencement of the alleged violation of law. Such notice shall include names of one or more of the owners of record, the name of the person initiating the action, and adequate identification of the structure and the alleged violation."

tuted a constructive denial of its request for enforcement and that the thirty-day appeal period specified in § 15 commenced running on that date and expired on August 5, 1981. As to the dispute over the building permit, Lovell measures the thirty-day appeal period from the date of the permit's issuance (July 10, 1981) making (according to its argument) an appeal from the permit's grant untimely if brought later than August 10, 1981. In Lovell's view, the requests for enforcement initiated by the letters of the plaintiffs' counsel on October 19, 1981 (followed by the building inspector's negative reply to those requests on November 18, 1981, and the plaintiffs' appeal to the board on November 19, 1981), were untimely in all respects.

The plaintiffs, on the other hand, look to the building inspector's written denial, on November 18, 1981, of both their requests for enforcement as the date which started the running of the thirty-day clock under § 15. In the plaintiffs' view, appeals filed with the board on November 19, 1981, and with the Superior Court on February 17, 1982 (the latter within twenty days of the filing of the board's decision with the town clerk, on February 1, 1982, see G. L. c. 40A, § 17), were timely.

We think that the written decision required of a building inspector by § 7 should be deemed the operative event for purposes of the plaintiffs' rights of appeal. Section 7 is unambiguous in requiring a response "in writing" with "the reasons therefor" when a building inspector "declines to act" on a request for enforcement. See *Quinn v. Zoning Bd. of Appeals of Dalton, ante* 191, 194-195 (1984) (where language of a statute is unambiguous, a court will construe it in accordance with its plain language). We also think that the language of § 8, which confers the right to appeal upon a "person aggrieved by reason of his inability to obtain . . . enforcement" contemplates, as a precondition to the right of appeal, the written response declining enforcement described in § 7.

In support of this interpretation, we consider significant the lack of any indication in either § 7 or § 8 that a building inspector's failure to respond within fourteen days to an en-

forcement request is to be deemed a constructive denial of the request for purposes of setting in motion the thirty-day appeal period provided by § 15. The fact that the Legislature, in other provisions of the present Zoning Act, has made express provision for the effect of failures to act by local zoning authorities strongly suggests that the absence of any like provision in § 7 or § 8 is purposeful.[9] Not only is an interpretation of §§ 7, 8 and 15 which links the time for an appeal by an aggrieved party to the permit granting authority to the date of the building inspector's written decision under § 7 faithful to the reasonably plain wording of the statutes, but it also provides a means for the fair and practical administration of the provisions of c. 40A governing enforcement of a zoning by-law at the local stage.[10]

---

[9] See the eighth paragraph of G. L. c. 40A, § 9 (providing that the failure of the special permit granting authority to take final action upon an application for a special permit within ninety days following the date of the public hearing on the application "shall be deemed to be a grant of the permit applied for"), and the fifth paragraph of § 15 (providing that the failure of a zoning board of appeals to act within seventy-five days of an application or petition "shall be deemed to be the grant of the relief, application or petition sought"). See also *Building Inspector of Attleboro* v. *Attleboro Landfill, Inc.,* 384 Mass. 109 (1981) (construing and applying the constructive approval provisions of § 9); *Capone* v. *Zoning Bd. of Appeals of Fitchburg,* 389 Mass. 617 (1983) (construing and applying the constructive approval provisions of § 15). The decisions which construe G. L. c. 40A, §§ 9 and 15, state that a constructive grant occurs not only when there is a failure to make a decision within the statutory time period but also when there is a failure to file the decision with the city or town clerk within the same time frame. See *Building Inspector of Attleboro* v. *Attleboro Landfill, Inc. supra* at 110-111; *Capone* v. *Zoning Bd. of Appeals of Fitchburg,* 389 Mass. at 623-624. See also *Elder Care Servs., Inc.* v. *Zoning Bd. of Appeals of Hingham,* 17 Mass. App. Ct. 480, 481-482 (1984).

The fact that §§ 9 and 15 speak of constructive grants, while we are here concerned with an argument for constructive denial, is of no significance. The absence of language in § 7 or § 8 specifying what is to happen on the fifteenth day after a request for enforcement, if the building inspector takes no action on the request, is the critical fact for our purposes. We cannot supply the missing language. See *Boylston Water Dist.* v. *Tahanto Reg. Sch. Dist.,* 353 Mass. 81, 83-84 (1967).

[10] An interpretation of § 7 which provides for constructive denial would likely spawn litigation to determine whether fumbling lay inquiries and protests addressed to building inspectors were in fact definitive requests for

We are not persuaded that a more restrictive construction is required by the designation in § 7 of a fourteen-day period for a response by the building inspector. This period is obviously designed to encourage promptness. In some cases, however, a building inspector may not be able to act on a request within fourteen days for legitimate reasons, such as (for example) the inspector's need to obtain further information from the complaining parties to clarify the nature of the complaint or his need to consult with other municipal boards or officers having an interest in the matter.[11] In our view, the fourteen day requirement in § 7 "relates only to the time of performance of a duty by a public officer and does not go to the essence of the thing to be done," *Cheney* v. *Coughlin,* 201 Mass. 204, 211 (1909); therefore it is directory and not mandatory. See *Cullen* v. *Building Inspector of North Attleborough,* 353 Mass. 671, 679-680 (1968), and cases cited. We conclude that the date on which a zoning enforcement officer responds in writing to a § 7 request for enforcement creates the appealable decision contemplated by § 8 and becomes the date for measuring the thirty-day appeal period set forth in § 15.[12] There is nothing to

enforcement, sufficient to start the running of the fourteen-day decision period.

[11] We leave for another occasion analysis of the concern that a slothful building inspector could prevent complaining parties from exercising their rights by doing nothing upon receipt of an enforcement request and whether, if the inspector refuses to act, the parties seeking enforcement may have an alternative to the time and expense which might accompany resort to a complaint in the nature of mandamus.

As to the owner's being made aware of a request for enforcement, we direct attention to the recommendations made in *Neuhaus* v. *Building Inspector of Marlborough,* 11 Mass. App. Ct. 230, 235 n.13 (1981).

[12] The legislative history of the enforcement and appeals provisions of c. 40A clearly supports our conclusion. See discussion in 1972 House Doc. No. 5009, at 59-61, indicating that the written decision requirement of § 7 is intended to provide a mechanism for direct appeal by an aggrieved party to the permit granting authority by creating an "appealable decision" and that "the Department [of Community Affairs] has recommended the mandatory practice of requiring local enforcement officials to render written decisions in cases where they decline to act on requests for enforcement of the zoning ordinance or by-law. One result of this procedure will be to make applicable the administrative appeal process of such situations."

the contrary in either *Neuhaus* v. *Building Inspector of Marlborough,* 11 Mass. App. Ct. 230 (1981), in the cases following that decision,[13] or in the Duxbury zoning by-law.

Applying this reasoning, we conclude that jurisdictional requirements pertinent to the complaint concerning the eighteen-wheel vehicles were met. The failure of the building inspector to respond to the plaintiffs' June 22, 1981, request was of no legal consequence. The plaintiffs' right of appeal to the board thus arose on November 18, 1981, when the inspector first complied with § 7 by his written response denying enforcement. Appeal to the board from the inspector's refusal of enforcement seasonably followed within thirty days of the inspector's denial (as required by G. L. c. 40A, § 15), and the appeal to the Superior Court from the board's decision was within the twenty days required by G. L. c. 40A, § 17.

The dispute concerning the building permit involves different considerations. Under § 13 of the prior c. 40A, a person aggrieved by a decision to issue a building permit could seek direct review of the decision. Until 1963,[14] there was no statutory time limit for pursuing that right of review and the setting of a "reasonable time" limit was left to local zoning by-laws. Failure to appeal within any time period set by the by-law foreclosed the right of direct review. See *Kolodny* v. *Board of Appeals of Brookline,* 346 Mass. 285 (1963).[15]

---

[13] See *William C. Bearce Corp.* v. *Building Inspector of Brockton,* 11 Mass. App. Ct. 930 (1981); *McDonald's Corp.* v. *Seekonk,* 12 Mass. App. Ct. 351 (1981); *Selectmen of Tewksbury* v. *Granfield,* 17 Mass. App. Ct. 1011 (1984). *Neuhaus* and its progeny stand for the proposition that there can be no resort to court action to enforce the zoning laws until aggrieved parties have exhausted their rights of administrative appeal. See also *Cape Resort Hotels, Inc.* v. *Alcoholic Licensing Bd. of Falmouth,* 385 Mass. 205, 207 n.3 (1982).

[14] By St. 1963, c. 207, the Legislature deleted the authorization of local zoning by-laws to prescribe a "reasonable time" for appeals to be taken under the prior G. L. c. 40A, § 13, and inserted a thirty-day time limit for § 13 appeals in § 16 of the prior Act.

[15] In *Kolodny,* the building permits issued on March 27, 1962, and the plaintiffs sought revocation of the permits on April 10, 1962. On April 26, 1962, the building commissioner refused to revoke the permits and the plaintiffs appealed his decision not to do so to the board. The March 27 date

It was recognized, however, in *Brady* v. *Board of Appeals of Westport,* 348 Mass. 515 (1965), that the right of direct review was not the exclusive remedy. The passage from *Brady* (at 519-520) set forth in the margin describes the shortcomings of the prior c. 40A in this area and the reasons necessitating an alternative remedy to correct violations of the zoning by-law made under color of a building permit.[16] In essence, *Brady* con-

---

which the permits issued was considered the crucial date for purposes of triggering the ten-day right of appeal specified by the Brookline zoning by-law as a "reasonable time" for an appeal. Hence, the commissioner's decision not to revoke the permits made after the expiration of the ten-day period was not an appealable decision, that decision being viewed as "no more than a reaffirmation of the [commissioner's] decision of March 27, 1962, to issue the permits" *Id.* at 288. A lawsuit based on the building inspector's April 26 decision was dismissed for lack of jurisdiction. *Ibid.* See also *Kolodny* v. *Building Commr. of Brookline,* 346 Mass. 289 (1963), affirming the right to enforce the zoning by-law by mandamus, but concluding that an action seeking such relief on the facts therein considered was premature.

[16] "Section 13 of c. 40A, as amended, does not, however, establish a comprehensive statutory scheme for enforcement which restricts to the statutory procedures action by individual citizens seeking to invoke the enforcement process. . . .

"The uncertain relation of § 13 to the enforcing process is apparent upon consideration of possible eventualities. Decisions granting a permit may not, within the appeal period, come to the attention of persons who will be aggrieved by a violation of the zoning law. . . . Construction under a permit may not be begun within the appeal period. The permit, or even construction under it, may not disclose the violation. . . . There is no requirement in the statute for notice to all persons possibly affected by an application for a permit. Aggrieved persons as to whom applicable provisions in respect of time of appeal are unreasonable may proceed by mandamus for enforcement of the law. . . . There is no provision in the statute requiring a written decision on requests for enforcement. If the decision not to comply with such a request is oral, no appeal lies. There is in such a case nothing except inaction to show what the decision is, and of course no date of decision from which to compute the time for an appeal. . . . If, as here, the response is in writing, there is nevertheless no notice to other persons aggrieved and no basis for barring them from mandamus. There would be no occasion for notice to anyone else if the person requesting action did not appeal from the enforcing officer's not to act.

"Failure to take an appeal within the prescribed period from the granting or denial of a permit is a bar to a direct review of the action in respect of the permit [citing, among other cases, the two *Kolodny* decisions, see note 15 *supra*]. In a proceeding for enforcement of the zoning law, however, the

firmed the existence of the right well-established in Massachusetts jurisprudence, of aggrieved citizens, to obtain, by means of mandamus, strict enforcement of the zoning by-law.[17] See *Sunderland* v. *Building Inspector of North Andover*, 328 Mass. 638, 640 (1952), and cases cited; *Hallenborg* v. *Billerica*, 360 Mass. 513, 519-520 (1971).

The *Brady* right appears implicit in the addition to § 22 of the prior c. 40A (by means of St. 1970, c. 678, § 1) of a proviso establishing a six-year limitations period for actions seeking to remedy zoning violations occurring under an "original building permit."[18] The six-year limitation period was inserted in the second paragraph of § 7 of G. L. c. 40A, see note 8, *supra,* to be read and applied in conjunction with the written response requirement of the first paragraph of § 7 and the rights conferred by §§ 8, 15 and 17. Thus, with the enactment of the new Zoning Act, the *Brady* right to mandamus as a remedy for zoning violations committed under color of a building permit became a right to request the officer charged with enforcing local zoning to enforce the by-law under G. L. c. 40A, § 7, and, if the requesting party is aggrieved by the inspector's decision, a right to seek administrative relief from the board under G. L. c. 40A, §§ 8 and 15, and, after exhausting

existence of a permit is inconsequential. . . . Hence, as this second of the *Kolodny* cases [346 Mass. 289] has established, the loss by an aggrieved citizen of the right of direct attack on a permit does not entail loss of the right of the same citizen to bring a mandamus petition for enforcement of the law and to stop violations in the construction going forward under the permit."

[17] The problems arising out of an aggrieved party's being unaware of the issuance of a building permit still exist. The holder of a building permit has up to six months from the date of its issuance to commence work under the permit. See 780 Code of Mass. Regs. § 114.3 (1980). There is no public notice of the issuance of a building permit. A permit holder could keep the fact of the permit's issuance secret, refrain from beginning construction under the permit for the thirty-day period established by § 15, and thereby foreclose any further direct review of the legality of the permit's issuance.

[18] See *Cape Resort Hotels, Inc.* v. *Alcoholic Licensing Bd. of Falmouth*, 385 Mass. at 216-218. See generally Holmes, Zoning Limitations — Limiting Enforcement of Laws Relating to Buildings, 55 Mass. L.Q. 377 (1970).

administrative remedies, a right to obtain judicial review pursuant to G. L. c. 40A, § 17. See *Neuhaus* v. *Building Inspector of Marlborough,* 11 Mass. App. Ct. at 232-235.[19]

Here the "original building permit," for purposes of § 7, was the permit authorizing Lovell to construct the second garage. See *Cape Resort Hotels, Inc.* v. *Alcoholic Licensing Bd. of Falmouth,* 385 Mass. 205, 217-218 (1982). We view the plaintiffs' written request on October 19, 1981, for enforcement, see note 5, *supra,* as an effort to stop allegedly unlawful construction from going forward under color of that permit. The building inspector's written denial of their request made the plaintiffs, under § 8, "person[s] aggrieved by reason of [their] inability to obtain . . . enforcement action," and they thereafter complied, in a timely manner, with the jurisdictional steps required by c. 40A and the *Neuhaus* decision. We conclude that the Superior Court had jurisdiction of the appeal from the board's decision affirming the issuance of the building permit.[20] See *Carstensen* v. *Zoning Bd. of Appeals of Cambridge,* 11 Mass. App. Ct. 348, 351-352 (1981) (applying this rule without discussing the same).

2. We turn to a consideration of the merits. In addition to the facts previously recited in this opinion, the judge's memorandum contained the additional findings of fact set forth in the appendix to this opinion. Based on all the facts found, the judge ruled that the construction of the second garage was

---

[19] These provisions of the new Zoning Act rid the enforcement scheme of the problems in the prior c. 40A, described in the *Kolodny* and *Brady* decisions, see note 16, *supra,* and continued the six-year limitations period within which the *Brady* right could be exercised.

[20] Prior to commencing their action challenging construction under the permit, the plaintiffs did not file in the local registry of deeds the notice required by § 7, see the appendix hereto, as a condition of such an action. The notice requirement appears to be in the nature of a lis pendens designed to give constructive notice to prospective purchasers and other interested parties that a question as to zoning exists with regard to the property. The failure to record notice would ordinarily require dismissal of the action subject to its being timely recommenced (if it can be), after the condition is satisfied, within the six-year limitations period. It appears here, however, that there are no other parties, beyond the parties to this action, whose rights are, or could be, adversely affected by the lack of notice. We conclude,

beyond the scope of the 1965 variance and constituted an unlawful expansion of a nonconforming use in violation of the Duxbury zoning by-law. The judge further ruled that Lovell's use of eighteen-wheel vehicles violated each of the three considerations set forth in *Bridgewater* v. *Chuckran,* 351 Mass. 20, 23 (1966), for determining the lawfulness of an expansion of a nonconforming use.

There was no error in the judge's rulings on the matter of the second garage. The 1965 variance confined Lovell to using the property for its "cesspool business, both as to the maintenance of the same and the construction of new cesspools," and allowed Lovell to "construct and maintain a [single] six-stall garage on [the] land . . . for the storage and maintenance of commercial vehicles and equipment." The variance sanctioned the first garage solely for the purpose of the storage and maintenance of vehicles used by Lovell in connection with the use permitted by the variance — the conduct of a cesspool business. The construction of the second garage violated the limits of the variance (and, as a result, in 1975, violated the permissible scope of the nonconforming use) that permitted construction of only one garage.[21] Compare *Selectmen of Stockbridge* v.

----

without formulating a general rule on the issue, that these appeals should be decided without regard to the plaintiffs' failure to record the notice. Compare *Pierce* v. *Board of Appeals of Carver,* 369 Mass. 804, 810-812 (1976).

[21] To the extent that the second garage might house equipment or vehicles used in connection with Lovell's cesspool business, its construction was precluded by the rule that the existence of a lawful nonconforming use does not permit the erection of additional buildings for the expansion or enlargement of that use unless permitted by the zoning by-law and the requirements of the by-law are followed. See *Wilbur* v. *Newton,* 302 Mass. 38, 43 (1938); *Inspector of Bldgs. of Burlington* v. *Murphy,* 320 Mass. 207, 210 (1946); *Connors* v. *Burlington,* 325 Mass. 494, 495-496 (1950); *Planning Bd. of Reading* v. *Board of Appeals of Reading,* 333 Mass. 657, 660 (1956); *Simeone Stone Corp.* v. *Board of Appeals of Bourne,* 345 Mass. 188, 192-193 (1962); *Bowes* v. *Inspector of Bldgs. of Brockton,* 347 Mass. 295, 297-298 (1964); *Garfield* v. *Board of Appeals of Rockport,* 356 Mass. 37, 40 (1969); *Powers* v. *Building Inspector of Barnstable,* 363 Mass. 648, 658 n.4 (1973). These decisions were under the prior c. 40A, but there is

*Monument Inn, Inc.,* 14 Mass. App. Ct. 957, 959 (1982) (enlargement of facilities in violation of special permit is an impermissible use of property).

As to the eighteen-wheel vehicles, the judge's findings of fact (which are supported both by the testimony he found credible and the documentary and demonstrative evidence) make clear that by associating in 1979 with Francesco Excavation Corp., Lovell had established and conducted, side by side on the premises with its cesspool business, a trucking business in connection with work as a general contractor and excavator. These latter enterprises were not permitted by the 1965 variance[22] (and thus were beyond the scope of the 1975 by-law protecting nonconforming uses) and constituted new, substantively different, uses from the authorized business. See *Building Inspector of Malden* v. *Werlin Realty Inc.,* 349 Mass. 623, 624-625 (1965).

Lovell argues that the eighteen-wheel vehicles are being used in connection with the lawful expansion of its cesspool business. On the facts found, the judge correctly concluded

nothing in the present c. 40A which could give reason to doubt their validity. There is also nothing in the applicable provisions of the Duxbury zoning by-law which would permit the construction of a building of the size of the second garage without a special permit or other relief from the board.

[22] Lovell argues that the 1965 variance also permitted a general contracting business. There is no mention in the variance of a general contracting business or of equipment used in general contracting work to be stored at the Mayflower Street premises. If Lovell found the variance to be ambiguous or incomplete, it had the right to seek clarification or to appeal.

In 1975, only Lovell's cesspool operation became a legal nonconforming use under the Duxbury by-law. There is nothing to indicate that Lovell ever received permission (in the form of either a variance or special permit) to conduct a general contracting business (under the present Duxbury by-law a nonconforming use cannot be changed except to a conforming use or except to another nonconforming use if a special permit is granted). Thus, the fact that eighteen-wheel trucks may have been used in connection with an illegal general contracting business is not pertinent to an inquiry regarding whether the requisite similarity has been shown between the current use of those trucks and the lawful cesspool business. See *Cape Resort Hotels, Inc.* v. *Alcoholic Licensing Bd. of Falmouth,* 385 Mass. at 214 (the increased use must be attributable to growth of the original nonconforming use in order to fall within the rule that an increase in volume of business does not constitute a change in use). See aslo *Kreger* v. *Public Bldgs. Commr. of Newton,* 353 Mass. 622, 627 (1968).

(in light of the rule that the party maintaining a nonconforming use has the burden of proving any expansion lawful, see *Cape Resort Hotels, Inc.* v. *Alcoholic Licensing Bd. of Falmouth,* 385 Mass. at 212) that Lovell had failed to demonstrate that the enlarged use satisfied the three considerations set forth in *Bridgewater* v. *Chuckran,* 351 Mass. at 23.[23] None of the other arguments made by Lovell persuades us that any different conclusion is required.

3. The remaining questions concern the judgments.

(a) The judge concluded that he could not ascertain, from the record, whether the second garage could be put to any lawful use or otherwise made to conform to the by-law. He, therefore, declined to order the garage removed pending an inquiry to determine whether relief could be obtained under the provisions of the by-law. Accordingly, part 1 of the judgments ordered only that Lovell be enjoined from using the second garage in connection with the use and maintenance of commercial vehicles and equipment. The decision to withhold

---

[23] These considerations are "(1) whether the use reflects the 'nature and purpose' of the use prevailing when the zoning by-law took effect . . . [citations omitted]. (2) Whether there is a difference if the quality or character, as well as the degree of use . . . [citations omitted]. (3) Whether the current use is 'different in kind in its effect on the neighborhood . . . [citation omitted].'" (1) The original nature and purpose of the use exempted from the zoning by-law was the maintenance and construction of cesspools. The judge correctly determined that the present emergence of a new business on the premises was an unlawful change from the original nature and purpose of the use. (2) The judge also correctly concluded that there is a difference in the character and degree of use between suppliers making infrequent deliveries of materials by means of eighteen-wheel vehicles and the garaging and maintaining of eighteen-wheel vehicles for use in a trucking, general contracting, and excavating business. See *Bridgewater* v. *Chuckran,* 351 Mass. at 24; *Cape Resort Hotels, Inc.* v. *Alcoholic Licensing Bd. of Falmouth,* 385 Mass. at 213-214. (3) Finally, the testimony that indicated increased noise, as well as serious traffic and safety problems, since Francesco Excavating Corp. started to conduct its operations from the Mayflower Street premises supported the judge's finding that the presence of eighteen-wheel vehicles on the property had an effect on the neighborhood that was different in kind. See *Cape Resort Hotels, Inc.* v. *Alcoholic Licensing Bd. of Falmouth,* 385 Mass. at 216.

an order for the removal of the second garage pending the possibility of further zoning proceedings was within the judge's discretion. See *Cullen* v. *Building Inspector of North Attleborough,* 353 Mass. 671, 678-679 (1968); *Selectmen of Blackstone* v. *Tellestone,* 4 Mass. App. Ct. 311, 316 (1976).

(b) Paragraph 2 of the judgment enjoined Lovell from "garaging or maintaining eighteen-wheel vehicles *or allowing the same on his property* [at] 789 Mayflower Street, Duxbury" (emphasis supplied). The non-italicized language fashioned relief which was reasonably related to the grievance to be remedied. See *Billerica* v. *Quinn,* 320 Mass. 687, 690 (1947); *Perez* v. *Boston Housing Authy.,* 379 Mass. 703, 730 (1980). The italicized language, however, is overbroad, since the facts found by the judge indicate that suppliers of Lovell's cesspool business had, from the inception of the business at the Mayflower Street site, made deliveries of materials, as necessary, to Lovell by means of eighteen-wheel vehicles. This aspect of the cases must be remanded for reconsideration of the scope of relief granted in light of the scope of the protected prior nonconforming use. The judge, if he deems it necessary or desirable, may hold an evidentiary hearing.

The italicized language in paragraph 2 of the judgments ("or allowing the same on his property") is vacated and that issue is remanded for the devising of new relief in accordance with this opinion. The balance of the judgments is affirmed. The plaintiffs are to have costs of appeal.

*So ordered.*

APPENDIX.

"The plaintiffs live in the immediate vicinity of the Lovell operation. Plaintiff Vokes resides at 761 Mayflower Street and plaintiff Boucher, at 748 Mayflower Street.

"Between 1975 and 1979, the Lovell operation used and garaged commercial vehicles customarily used in a cesspool and septic tank maintenance and installation service on the Mayflower Street property. These included bulldozers, standard size pump trucks (i.e. not eighteen-wheelers), standard

size dump trucks, a 'loader,' and other vehicles of similar size and function. Vehicles were garaged in the six-stall garage which Lovell had built in accordance with the terms of the 1965 variance.

"During these years, supplier made infrequent but regular deliveries of materials used in Lovell's business (e.g., gravel) in eighteen-wheelers. Eighteen-wheel vehicles were never regularly garaged or maintained on the Mayflower Street property during these years.

"In the latter portion of 1979, Lovell entered into a general partnership with Francesco Excavation Corp. (Francesco). Francesco is in the business of excavating and transporting excavated materials and other bulk materials. Francesco owns and maintains several eighteen-wheelers in connection with its business. The terms of the partnership are basically that Francesco may have full use of Lovell's Mayflower Street facilities for storage and maintenance of its vehicles and that Lovell may have use of Francesco's vehicles as Lovell may need them for deliveries and so forth in connection with its business. Francesco has listed 789 Mayflower Street, Duxbury, as its main address since the latter portion of 1979.

"During the early portion of 1981, Lovell, through Mr. Avery Lovell, inquired of the [b]oard whether a special permit would be necessary for the construction of an additional garage on the Mayflower Street property. The [b]oard informed Mr. Lovell that a special permit would not be necessary and issued a memorandum to the building inspector to that effect. . . . A building permit was issued to Lovell in July of 1981. Lovell constructed a second garage, comparable in size to the first garage, shortly thereafter. The second garage is used for maintenance work on Francesco's trucks and storage of trucks and equipment. Lovell did not have need for additional storage space for its own vehicles and equipment at the time the second garage was constructed.

"In the years following 1970, a number of residences were built in the immediate vicinity of the Lovell operation. Persons living in these residences registered no complaints regarding the Lovell operation with Lovell or town officials prior to the latter portion of 1979. Since that time, residents have been complaining. The residents report an increase in the level of noise emanating from the Lovell operation during the latter portion of 1979 described by one resident as 'phenomenal.' Noises heard are described as 'blasting' sounds, 'chains clanking,' horns blowing, and truck engines starting. Noise is heard at night, at 3 or 4 A.M., and on Sundays as well as during regular business hours. The neighbors were not disturbed by noise emanating from the Lovell operation prior to the latter portion of 1979.

"The neighbors also report that a serious traffic problem has developed since the latter portion of 1979 due to what one resident described as an 'almost constant traffic' of eighteen-wheelers on the narrow residential roads in the area surrounding the Lovell operation. [Here a footnote observed that

'On Mayflower Street, two cars are able to pass easily in the summer months but only with difficulty during the winter months when there is snow.'] On one area road with a fairly sharp curve, residents have been run off the road by eighteen-wheelers travelling toward them. Neighborhood children have been forced to abandon Mayflower Street as a bicycle route. Residents report being regularly in fear for the safety of themselves and their families while driving on the neighborhood roads."